**In the Matter of The ANN ARBOR RAILROAD COMPANY, Debtor.**

**No. 74–90833.**

United States District Court,
E. D. Michigan, S. D.

April 14, 1976.

---

Joseph Radom, Detroit, Mich., for Trustee of The Ann Arbor R. Co.

William Golub, New York City, for The Ann Arbor R. Co.

Saul A. Green, Asst. U.S. Atty., Detroit, Mich., John Broadley, Dept. of Justice, Washington, D.C., for U.S. Dept. of Justice.

John Krsul, Detroit, Mich., for Manufacturers Hanover Trust Co.

Walter J. Murray, Detroit, Mich., for Green Bay and Western R. Co.

Frederick C. Nash, Detroit, Mich., for Detroit, Toledo & Ironton R. Co.

James B. Schouman, Dearborn, Mich., for United Transportation Union.

George B. Schwahn, Asst. Atty. Gen., Madison, Wis., for State of Wis.

Robert J. Taube, Asst. Atty. Gen., Lansing, Mich., for State of Mich.

Kenneth L. Crosson, Washington, D.C., for Consolidated Rail Corp.

Edward Roberts, III, New York City, for Manufacturers Hanover Trust Co.

John G. Harkins, Philadelphia, Pa., for Consolidated Rail Corp.

William T. Lake, William T. Finley, Jr., Howard Wilchins, Washington, D.C., for United States Railway Assn.

MEMORANDUM OPINION IN SUPPORT OF ORDER UNDER SECTION 211(h)

PHILIP PRATT, District Judge.

Pursuant to the reservation made in the order under Section 211(h), filed March 31,

1976, the Court submits the following as its reasons for that ruling.

During the course of these proceedings, this Court approved orders directing sales of an inoperable car ferry and non-railroad lands which were subject to the indenture mortgage of Manufacturers Hanover Trust ("MHT"). The orders authorizing the sales contained provisions similar to the following:

> "IT IS FURTHER ORDERED that the Trustee shall deposit the net proceeds from the sale of the above described real estate, now subject to the lien of the first mortgage dated July 1, 1895 held by Manufacturers Hanover Trust Company as Successor Trustee under said mortgage ('Mortgagee'), in a separate trust account at the Manufacturers National Bank at Detroit, Michigan, to which the mortgage lien shall be transferred.

> \* · \* \* \* \* \*

> "IT IS FURTHER ORDERED that the proceeds of the sale herein authorized shall not be used or·availed of by the Trustee for any purpose whatsoever pending the further order of this court."

Thus, the Court authorized creation of a liened escrow account, subsequently designated by the debtor as ICC Account 716, the use of which was restrained pending legislative and judicial determination of its application. The restraint was understood to reflect the uncertainty attendant upon use of such funds under the Rail Reorganization Act ("RRRA"; "Act"), 45 U.S.C. § 701 et seq.

On February 20, 1976, the United States Rail Association (USRA) petitioned this Court, pursuant to § 211(h) of the Act (45 U.S.C. § 721(h)), for an order identifying the funds held in escrow as part of "that cash and other current assets of the estate of such railroad" to be used to satisfy certain accrued obligations enumerated in § 211(h)(1). The Trustee, and the creditors, both secured and unsecured, oppose the petition, on the grounds that the escrowed funds do not constitute "cash" or "current assets," and that application of such funds to operating expenses contravene the principles of § 77 of the Bankruptcy Act (11 U.S.C. § 205), as articulated in the case of *In Re Penn Central*, 494 F.2d 270 (3rd Cir. 1974), cert. den. 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974) (*Columbus Option*). Moreover, they assert that use of the monies in the manner sought is unconstitutional.

It would seem appropriate at this juncture to describe briefly the status of the Ann Arbor Railroad in the conveyance-date time frame.

Under the Final System Plan, the Ann Arbor is divided into several sections. The section from Toledo, Ohio to Ann Arbor, Michigan, including the rolling stock and equipment, is being purchased by the State of Michigan under Section 208(d) of the Act. The section from Ann Arbor to Durand remains with the estate as does the section from Cadillac to Frankfort. The Trustee and the State of Michigan have entered into a one-year lease as to these sections, including the ferries operating from Frankfort to Wisconsin. The section from Durand to Ashley is being purchased by the Grand Trunk Western Railroad, a profitable railroad under the Act. The remaining section, from Ashley to Cadillac, is apparently being purchased by the State of Michigan under Section 206(c)(1)(D) of the Act; apparently because, as the Court is advised by USRA, a clerical error excluded that section from the Final System Plan as certified to the Special Court and corrective documents are being filed on March 31, 1976 with the Special Court. A significant aspect of the Ann Arbor reorganization is that Consolidated Rail Corporation (Con-Rail) will not be the purchaser of any portion of the railroad. Therefore, there is no issue as to the value of ConRail stock or USRA certificates. The portions taken will be paid for in cash by the purchasers, i. e., the State of Michigan and the Grand Trunk.

While exact figures as to the financial status of the Ann Arbor are not available as of March 31, 1976, the existence of a total short fall between available assets over accrued operating expenses is undisputed.

The estimates of that short fall vary from approximately $1,000,000 to $1,250,000. (Schedules A and B of Joint Exhibit 1 and Joint Exhibit 4). In addition to that short fall, consideration must, of course, be given to continuing administration expenses as reduced by anticipated revenues. That figure has been estimated to amount to approximately $291,000 for the first post conveyance year, $199,000 for the second and $174,000 for the third. (Schedule C of Joint Exhibit 1). There are also some variables which will affect the final accounting, i. e., the responsibility for accrued vacation pay (which the Court has reserved at the request of the parties), the term and rental of properties to the State of Michigan, the costs of administering the agency agreement and other items not covered by Section 211(h).

Further, as set out more fully in the Memorandum Opinion under Section 207(b), filed on May 1 1974, the debt structure of the Ann Arbor at year end 1973 was as follows: a funded debt of Seven Million Dollars ($7,000,000) represented by First Mortgage 4% Gold Bonds maturing in 1995; conditional sales contracts of $700,000 maturing in 1979 and unsecured advances from the Detroit, Toledo and Ironton Railroad (DT&I) of approximately Nine Million Dollars ($9,000,000). Current obligations, excluding the foregoing, amounted to approximately $7,210,000. Current assets were listed at $5,221,000; properties at $19,761,-000 and other assets at $1,352,000. The report based on those figures reflected a shareholder's equity of $2,182,000. (DT&I owns 99.94% of the issued shares).

Since 1973, the debtor has, of course, operated at a loss and there have been corresponding increases in unpaid interest and other deferred liabilities and credits. (See Report of Debtor filed herein on February 10, 1976, for period ending December 31, 1975).

It is also important to note the history of the escrow fund. It was created by various orders of this Court approving the sales by the Trustee of an inoperable ferry and non-railroad lands. The method used to report the escrow fund was account number 716 of the *Uniform System of Accounts for Railroad Companies* issued by the ICC (49 CFR 1200–1299). However, the method of reporting should not be confused with the intrinsic nature of the fund and its purpose. As pointed out above, the time that the issues of the use and application of the monies received from said sales was presented was not propitious for making a judicial determination. Implicit in the reservation of the issues is the concern of the Court that it may have become necessary to invade that fund in order to provide essential rail services. Thus the Court had to consider that a time could arise before final conveyance, a then undeterminable date, when no other funds, including Section 213 grants, would be immediately available for that purpose.

At the outset, it is prudent to note that the arguments of counsel give rise to two distinct questions: the interpretative question involving the scope of the statutory language, and the constitutional question involving the validity of the statutory mandate. Since the latter question, has, by stipulation, been reserved pending decision on the interpretative issue, this Court will only address the interpretative issue at this time.[1]

In the view of this Court, the issue for resolution is whether § 211(h) requires or permits that the escrow funds be applied to the operating expenses enumerated in (h)(1), in derogation of the rights and interests of secured creditors. Since the RRRA supplements § 77, and, to the extent of any conflict, is controlling (45 U.S.C. § 791(b)), *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 153–154, 95 S.Ct. 335, 363, 42 L.Ed.2d 320, 359 (1974) ("RRRA Cases"), there are two lines of inquiry: First, the Court must determine the proper meaning of § 211(h), which necessarily governs the

---

1. Its decision is without prejudice to arguments on the constitutional question and is reserved at the request of the parties.

controversy in the event of conflict with § 77. (Part A). Secondly, the Court must ascertain whether the principles of § 77 are compatible with § 211(h), and whether those principles offer constructive guidance in the interpretation of the phrase "cash and other current assets." (Part B).

On January 28, 1976, Congress passed the *Railroad Revitalization Act*,[2] which added subsection (h) to § 211 of the RRRA.[3] In broad outline, that amendment denominates six categories of accrued pre-conveyance, current operating expenses (§ 211(h)(1)). It then authorizes the USRA to make loans not to exceed $230 Million in the aggregate to ConRail in order to pay those expenses if certain conditions, including the inability of the railroad to meet the obligations and the necessity of payment to avoid disruption in service, are met (§ 211(h)(1)(A–E)). In addition, USRA is authorized to petition the Court to identify "cash and other current assets of the estate" utilized to satisfy (h)(1) obligations in a manner consistent with § 77. (§ 211(h)(3)(A) and (B)). ConRail then receives a right of reimbursement by way of administrative claim against the estate (§ 211(h)(4)(c)). However, if such reimbursement is not forthcoming in the post-conveyance period, USRA may forgive the ConRail indebtedness and thereby eliminate ConRail's claim against the estate. USRA then succeeds to a super-priority claim against the estate (§ 211(h)(5)(A)).

## A. *Meaning of Section 211(h)(3).*

In determining the place, if any, of liened escrow funds in the payment scheme of § 211, this Court discerns two basic approaches: a strict legislative intent approach which focuses on the statutory language of § 211(h) and specific congressional consideration of all pertinent and foreseeable circumstances; or a more liberal legislative purpose approach which looks to the operation and thrust of the statute as a whole in deriving the meaning of a particu-

lar section. A review of the RRRA and its background has convinced this Court that the purpose approach is more apposite and that such approach leads to the conclusion that the funds should be applied to the payment of § 211(h)(1) debts. The Court does so, however, despite a number of reservations which it will also explore.

Any analysis of the purpose of the RRRA necessarily begins with a recognition of the grave situation posed by the § 77 bankruptcies of seven railroads in the Northeast and Midwest. (U.S.Code Cong. & Adm.News 1973, p. 3242 et seq.). The Congressional response to this "threat to the national welfare" (*In Re Penn Central*, 384 F.Supp. 895, 902 (Special Court 1974) ["Sp.Ct."]) was enactment of the RRRA of 1973,[4] which established a unique reorganization process to facilitate orderly regeneration of rail service in the affected region. The RRRA also appreciated the limitation of traditional § 77 procedures and extended and liberalized § 77 (Sp.Ct. at 903), by creating USRA and ConRail to supervise the reorganization, develop a final system plan (Title II), and acquire and operate the properties finally conveyed in that plan (Title III). The major steps in the revised reorganization process entail: (1) a finding by the reorganization court that § 77 is inadequate (§ 207); (2) preparation by USRA of the Final System Plan and transfer of properties to ConRail in return for securities (§ 301); (3) conveyance to ConRail or to other entities, including states (§§ 206(c), 208(d)) of all right, title and interest in the rail properties in the Final System Plan (§ 303); (4) determination of the fairness and equity of the conveyance (§ 303); (5) prohibition of the abandonment of rail service at will (§ 304(f)).

The overriding theme of the RRRA is the paramount public interest associated with continued operation of the rail lines and the obvious inability of private interests, most

---

**2.** 90 Stat. 31, 93–5; § 606 of Railroad Revitalization Act.

**3.** The text of the amendments, comprising § 211(h), are set forth in Appendix A.

**4.** 45 U.S.C. § 701 et seq.

notably those of creditors, to provide an effective counterweight. Thus, Congress was impelled to action by the realization that:

"Rail transportation problems in the Northeast and Midwest region of the National are approaching crisis proportions . . . Their (railroad) services are not only essential to the prosperity and well-being of the people and industry of the Northeast and Midwest, but they are essential to the well-being and prosperity of the Nation as a whole. Cessation of service on the Penn Central alone would have drastic consequences throughout the United States

. . . . .

"The entire economy of the United States would suffer drastically if railroads in the Northeast and Midwest shut down operations." (2 U.S.Code Cong. & Adm.News, at pp. 3248–9 (1973)).

Congress accordingly devised a legislative scheme which simultaneously insured continued rail operations, and provided for expedited financial rejuvenation and consolidation of the system throughout the entire region. (See Findings and Purpose, 45 U.S.C. § 701).

The legislative design reflects the concerted effort to balance the relevant public and private interests, that is, to "give the creditors and stockholders of railroads in reorganization full due process of law while accommodating the public interest in getting the operations of the new Corporation started at the earliest time and in settling its obligations as expeditiously as possible." (1973 U.S.Code Cong. & Adm.News, at p. 3275).

Thus, after proper balance of competing interests has been adjudicated (§ 207), the RRRA mandates continuing operations (§ 304(f)), but provides grant and loan funds for maintenance and improvements (§§ 211, 213, 215), against the specific time table of the Final System Plan and conveyance (§ 303).[5]

On a practical level, the policies of the RRRA have created a preference for continued rail operations over immediate preservation of creditors' property interests. More specifically, the mandated continuation of services has produced administrative claims against the estates, which enjoy priority over creditors' claims, and, at least arguably, create some erosion of the assets. This erosion process has been discerned as involving administrative claims, trustee's certificates with superior liens, "conveyance taking," and use of cash or property held as secured liens to pay operating expenses (Sp.Ct. at 923). The latter instance, is, of course, particularly pertinent to the issue at bar.

That the RRRA may, in fact, produce such consequences is not in serious dispute. There is no question that its impact accumulates debt, defers payment, and uses the assets of the estate. Under § 211, for example, government loans become expenses of administration. Under § 215, the increase in value of property attributable to use of government funds inures to the benefit of the government and not to the creditors. Moreover, the use of "reasonable conditions" to receipt of funds has resulted in some attempts to subrogate the government to obligees, thereby continuing debt at the expense of creditors (In Re Ann Arbor Railroad, C.A. 4–90833 (E.D.Mich., June 6, 1975); In Re Penn Central, 395 F.Supp. 567 (E.D.Pa.1975), vacated as moot (3rd Cir. March 3, 1976) ).

Yet, it has consistently been the position of the courts that such a situation is acceptable, and that creditors' remedies must be delayed pending implementation of the plan, to permit orderly transition in rail services. (Sp.Ct.; RRRA Cases). Thus, the Special Court at 927 quoted 389 U.S. 486, 510–11, 88 S.Ct. 602, 614, 19 L.Ed.2d 723, 742 with approbation:

"While the rights of the bondholders are entitled to respect, they do not command

---

5. On the need to regenerate in addition to continue, See 1973 U.S.Code Cong. & Adm.News, 3251, 3253–4, 3256–7.

Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interests may or may not be served by the destructive move."

More specifically, the decisions clearly hold that creditors' rights can be fully vindicated under the Tucker Act in the Court of Claims. (*Id.*)

Nowhere is this mechanism more graphically illustrated than in the operation of § 303,[6] which provides that within ten days after delivery of the Final System Plan to the Special Court, ConRail shall deposit its securities.[7] The Special Court must thereupon order conveyance of the rail properties "forthwith," "free and clear of any liens and encumbrances," with specified exceptions including security interests in rolling stock (§ 303(b)(3)). It is only *after* conveyance that the Special Court considers whether the transfers "are in the public interest" and are "fair and equitable" to the estates (§ 303(c)(1)(A)), with a series of corrective options which, according to the Special Court, may prove inadequate and necessitate resort by the debtor to the Tucker Act. (Sp.Ct. at 929–932).

The § 303 mechanism, thought by some to be "the genius of the Act" enables ConRail to get off to a reasonably quick start (Sp.Ct. at 926). It is "the only mechanism, short of condemnation, that would permit ConRail to begin operation within any reasonable time." (Id.). To achieve that end, Congress deliberately postponed questions concerning the transfers:

"It is the intent of the Committee that the rail properties designated in the Final System Plan be conveyed first, and that any and all litigation concerning the amount or type of payment or consideration take place thereafter. The timely implementation of the Final System Plan cannot be obstructed by controversy over

the payment of properties." (Sp.Ct. at 927, quoting S.Rep.; RRRA Cases, 419 U.S. at 128, 95 S.Ct. at 351, 42 L.Ed.2d at 344).

In addition, it provided that with the exception of security interests attaching to equipment *necessary for continued operations,* properties were to be conveyed free and clear of liens.

 Thus, it is manifest from the operation of the RRRA that its design guarantees continuity of rail service by according primacy to operating expenses, at the cost of incurring debt and possibly eroding assets, with the deferred safeguards of § 303 and the Tucker Act. It is against that backdrop that this Court must evaluate § 211(h).

 It is clear to this Court that the amendments of § 211(h) are cast in the same mold as RRRA as a whole. By its terms, it is directed to an uneventful and expeditious implementation of the Final System Plan. The explicit thrust of the section is "to [i]nsure an orderly transition from the bankrupt railroads to ConRail and acquiring carriers." (1976 U.S.Code Cong. & Adm.News, pp. 147, 199). Thus, it anticipates that the estates may be unable to meet *accrued,* current *operating expenses,* and allocates loan monies to facilitate the transition, with a provision for *later* reimbursement. Moreover, it recognizes the primacy of those expenses, as claims of administration, by requiring that cash and current assets be applied to them on a priority basis. In addition, it does not relieve the estate of any obligations. Rather, it creates high priority claims which necessarily displace creditors. Thus, it appears to this Court that the interpretation of which funds are applied to continue operations of § 211(h) must conform to the fundamental precept of the RRRA: that creditors' rights yield to the interest of the public in uninterrupted rail services. Accordingly, this Court finds that the phrase "cash and other

---

**6.** § 303 (45 U.S.C. § 743), is set forth in Appendix B.

**7.** Other purchasers have similar obligations.

current assets," must, within the context of the Act, include the liened escrow fund.

Furthermore, scrutiny of the particular competing interests supports that conclusion. The public interest in effectuating the implementation without service disruption is especially sensitive and outweighs the creditors' interests in the liened account. Invasion of such funds, specifically envisioned by the Special Court (at 923), is in keeping with the judicial conclusion that creditors' remedies may be postponed. There is no indication in the cases that a distinction between secured and unsecured interests is in any sense dispositive. In fact, the Act itself, in providing for conveyance "free and clear of liens" (§ 303), evidences an intent to override secured interests *at the critical point of conveyance.* Therefore, it is particularly analogous to the situation *sub judice.* The exception for secured interests in rolling stock (§ 303(b)(3) ), supports that analogy in that it applies to security which *relates to operations.* Therefore, it is in keeping with the philosophical thrust of the Act, and does not alter the Court's conclusion that the funds in question should be used to pay operating expenses. Section 303 also affects the rights of secured creditors with respect to valuation:

> "Also, secured creditors have not been entitled to receive securities with a present market value equal to the dollar amount of their claims. Rather, secured creditors have been treated as long-term investors in railroad property who are only entitled to have the securities they receive valued according to the projected value of the reorganized railroad over a reasonable period of time." (1973 U.S. Code Cong. & Adm.News at p. 3274).

Thus, the Act does not regard the interests of secured creditors as inviolable. Accordingly, this Court is of the opinion that their interests must be secondary to the 211(h) interest in problems for implementation.

■ In addition, this Court is of the opinion that the term, "cash and other current assets" is intended to include those liquid assets available at the time of conveyance which the Court orders applied to 211(h)(1) obligations. Unhappily, the term is nowhere defined in the Act. Moreover, a review of the rather sparse legislative history [8] does not indicate that Congress was expressly aware of the escrow problem. Nevertheless, the history of the section does offer some guidance as to its intended meaning. The initial bill, H.R. 10979,[9] provided that the USRA could lend money "in an amount adequate to enable the Corporation . . . to meet obligations." Reimbursement in the post-conveyance period was to be obtained from "all cash and any other current assets arising from railroad operations accrued on its bonds as of the date of conveyance."[10] Thus, the Act in its final form differs from the original draft in several significant respects: (1) it deletes the qualifier "arising from railroad operations," (2) it substitutes a definite amount for the "amount adequate" language, (3) it requires that the *court* identify the cash and other current assets involved for application to operating expenses in conjunction with, or prerequisite to, allocation of loan monies.

■ In the view of this Court, the following inferences may be deduced from the legislative action. Congress, concerned with implementation and a trouble-free transition, but cognizant of an appreciable

---

**8.** The provision was not the subject of hearings. It first appeared in H.R. 10979. (See House Rep. 94–725, Dec. 12, 1975). It was considered by the Committee of Conference (H.Rep. 94–768 94th Cong., 1st Sess on S2718 (Dec. 19, 1975) ), and appears to have been substantially in its present form in Reports of the House and Senate Conference in late January, 1976 (H.Rep. 94–781, Report of Committee of Conference in S2718 (Jan. 23, 1976), Senate Conference Report No. 94–595, To Accompany S2718 (Jan. 27, 1976) ), U.S.Code Cong. & Admin.News 1976, p. 6. However, the reports are devoid of any meaningful comment as to the meaning of the provision.

**9.** Section 910(h), set out in Appendix C.

**10.** For legislative explanation of the provision, see H.Rep. 94–725, Report of Committee on Interstate and Foreign Commerce on H.R. 10979, December 12, 1975, at 99, 128.

short fall in operating expenses, determined to provide some needed dollars to pay for accrued obligations. After due consideration, it determined to insure against disruptions, without provision of potentially limitless federal funding. Accordingly, it altered the operation of the section to provide a definite sum, insufficient in itself, to supplement the available funds of the estate. In so doing, it manifested an intent to utilize available funds from the estate. Thus, it deleted the limitation "arising from railroad operations," thereby broadening the definition of the applicable funds. Moreover, in providing for resort to the court, it obviously anticipated disputes concerning the identification of assets, rather than a simple bookkeeping approach. In so doing, Congress committed the task of defining "cash and current assets" to the judicial arena. Accordingly, such indicators as ICC definitions and account designations should not be viewed as controlling. That is especially the case in a situation such as the one at bar, in which the account designation (ICC 716—Capital Account) was assigned at a time when the ultimate characterization and use of the funds was admittedly unclear. Therefore, the funds were escrowed according to their source at the time of the sale, subject to the understanding that Congressional intent and judicial interpretation could well alter their designation. That eventuality has now materialized, and the Court feels compelled to look to their essence as presently available liquid assets in determining whether they fall within the purview of § 211(h)(3).

■ In light of the clear pattern of operation of the RRRA, the compatibility of § 211(h) with that pattern, and the apparent motivation of Congress, this Court accepts the definition of the term "cash and other current assets" as including all cash and other assets for which the most plausible future course is prompt liquidation.

The emphasis on liquidity comports with the Congressional intent that available funds be identified by the court, regardless of their formal designation.

Moreover, this Court feels that traditional accounting notions of "cash" and "current assets" should not be literally applied in interpreting a law which eschews the traditional, especially in light of the abrupt and mandated end of the railroad. According to the ICC *Uniform System of Accounts for Railroad Companies* (1974) (49 CFR 1200–1299), current assets include:

"Cash, those assets which are readily convertible into cash or are held for current use in operations . . . which are subject to settlement in the ordinary course of business within one year." (At 32).

Since "cash and current assets" are the normal source of payment for operating expenses,[11] Congress was simply utilizing a term of art, in its generic sense, to connote those assets, *defined by the court,* to be applied to payment of current operating expenses. In addition, the ICC definition of current assets, in referring to "cash" and "convertibility," stresses the characteristics of availability and liquidity. The language of § 211(h)(3)(B), "all *such* current assets, including cash *available* . . ." highlights the emphasis on availability with specific reference to the terms of § 211(h)(3)(A). The "current use" of the assets is a judicial concern, not necessarily related to the ICC account designation. Therefore, this Court's definition of the term as encompassing assets available to pay operating expenses derives from the ICC standard definition.[12]

In the view of this Court, its decision recognizes the exigencies of the situation. Although Congress evidenced no awareness of the escrow problem, it is now apparent that the loan funds allocated are insuffi-

---

11. Current assets, including cash, are "those assets which are readily convertible into cash or are *held for current use in operations* . . . ." (ICC *Uniform System of Accounts for Railroad Companies,* at 32 (1974) ).

12. This Court is aware of the creditors' arguments concerning the strict definitions of cash and current assets, as they apply to the ICC account designation. However, for the reasons presented in the foregoing decision, it feels compelled to reject those arguments.

cient to insure continuous operations.[13] At this late hour, there is no time to seek further Congressional appropriations. Therefore, application of these funds to operating expenses to avert service disruptions, in furtherance of the purpose of the Act, is necessary, especially in view of the availability of the Tucker Act remedy (Sp. Ct.; RRRA Cases).

In requiring that funds held in account 716 be utilized to diminish the aggregated short fall, this Court is persuaded by the observation of the Special Court, at 952:

> "The principle that a particular railroad may be required to make sacrifices in the interest of the railroad system as a whole goes back as far as the notable opinions of Mr. Justice Brandeis in the New England Divisions Case (citations omitted) . . . Two more recent lines of decision also furnish strong analogical support for the conclusion that Congress may constitutionally compel a union of assets of the bankrupt railroads in the northeast provided just compensation is afforded."

In view of the Congressional determination to create a unitary and viable rail system (RRRA Cases, 419 U.S. at 109, 95 S.Ct. at 341, 42 L.Ed.2d at 334), this "sacrifice" appears to be necessary and calculated to create a "union of assets" and to commence operation of a vital and effective rail network.

B. *Interrelationship of § 77 and § 211(h)*

■ It is now well-settled that the RRRA supplements and liberalizes, but does not supersede, § 77 of the Bankruptcy Act. (RRRA Cases, at 153, 95 S.Ct. at 363, 42 L.Ed.2d at 360. *In Re Penn Central,* 533 F.2d 1347 (3rd Cir. 1976) ). Thus, when the provisions of the two statutes are at odds, the text of the RRRA controls. However, when the two are compatible, they may be construed *in pari materia.* In such cases, the Court retains a residuum of § 77 equita-

ble power which permits it to exercise a measure of discretion in interpreting and implementing the provisions of the RRRA. (*In Re Ann Arbor Railroad,* # 74–90833 (E.D.Mich., June 6, 1975); *In Re Penn Central,* 533 F.2d 1347 (3rd Cir. 1976) ). Accordingly, § 77 principles, if consistent with the RRRA, can be utilized to define and refine the meaning of the RRRA. In the case at bar, the Court finds that its interpretation of § 211(h) comports with § 77 requirements, as articulated in the *Columbus Option* case.[14] Therefore, it would appear proper to incorporate those principles into the definition of "cash and current assets."

■ The *Columbus Option* case sets forth three requisites to the invasion of liened escrow funds: (1) high probability that the debtor can be reorganized in accordance with the Bankruptcy Act; (2) funds are not otherwise available; (3) the secured creditors will not be prejudiced. (At 273–4). The Court is persuaded that the tests of § 77 are satisfied.

As the Court previously noted, the escrow fund here was segregated and retained pending legislative and judicial developments and also constituted a "rainy day" fund which the Court could look to in case of need, assuming compliance with § 77 requirements. It would appear that the need has now arisen, different only perhaps in terms of the time and the circumstance. When the fund was created there were uncertainties as to the viability of the entire Act and, therefore, the potential for reorganization. There was uncertainty as to the time of conveyance and the availability of funds from the Act or other sources to continue operations. There was also uncertainty as to the availability of the Tucker Act and its effect on the erosion issues. Developments have altered the circumstances, but not necessarily the principle.

---

**13.** The estimate of the aggregated short fall presented at oral argument was $95 Million.

**14.** See also *In Re Third Avenue Transit Corp.,* 198 F.2d 703 (2d Cir. 1952); *In Re Penn Cen-*

*tral,* 474 F.2d 832 (3rd Cir. 1973); *In Re Central of New Jersey v. Manufacturers Hanover Trust Co.,* 421 F.2d 604 (3rd Cir. 1970).

Reorganization is, of course, now a reality and not a mere probability. The judicial determinations that the process and conveyance are "fair and equitable" (§§ 207, 303), make reorganization under the RRRA equivalent to that under § 77. It is also apparent that the only funds presently available are the loan funds of § 211(h), but that these funds are insufficient to meet projected needs. No other sources, save legislative intervention, are realistically approachable. The remaining question is the one dealing with prejudice to creditors.

In the context of the Ann Arbor bankruptcy, that prejudice can be characterized as the prejudice attendant to delay as opposed to a prejudice of reduced recovery, at least on the record submitted to this Court.[15]

■ The Ann Arbor under the Final System Plan will convey approximately 180.2 miles of its total 292.3 miles to the State of Michigan and the Grand Trunk Railroad and will receive cash for that conveyance. The remaining 112.1 miles is retained by the Ann Arbor and is being leased, along with two ferries and the docks and appurtenances at Frankfort, to the State for one year at a rental of $600,000. Since the estate has recourse to the Special Court for valuations under the Act and to the Court of Claims under the Tucker Act, it is difficult to comprehend any significant prejudice to creditors. As a matter of fact, the estate, by suggesting the turn-over of the funds to secured creditors leaves itself no alternative but to borrow funds under § 211(h), funds which will have a super priority, exact an appreciable interest rate and which will necessarily increase the burden on the estate. Considering, too, that the amount here involved ($422,000) is less than 2% of the total debt obligations and less than 6% of the secured obligations, it does not appear that any great hazard, other than delay, arises.

While not addressing itself specifically to the issue of delay and its prejudicial effects, the Supreme Court in the RRRA Cases did indirectly consider the problem. A major premise of the ruling was that:

"There are, therefore, ample, adequate '[s]afeguards . . . to protect the rights of secured creditors . . . to the extent of the value of the property . . . .'" (419 U.S. at 154, 95 S.Ct. at 364, 42 L.Ed.2d at 359).

The Court went on to hold that insofar as a compensable taking was shown, the Tucker Act would apply. Of significant interest in the Court's discussion of the Act vis-á-vis § 77 is the finding that the fact that the Act *required* a conveyance before it was possible to ascertain whether the creditor could get ". . . all of the value of his lien and his share of any free assets," (419 U.S. at 154–155, 95 S.Ct. at 364, 42 L.Ed.2d at 360) did not create a fatal defect because of the remedy under the Tucker Act. The gist of that finding is that any prejudice created by the taking with the existing uncertainties of adequate resources to compensate the estate and its debtors, and implicitly *the delay necessarily occasioned* thereby, would not invalidate the Act. The effect of the finding, in this Court's view, is that mere delay in realizing the full value of the lien and a share of any free assets is not prejudice of such proportions as would dictate a refusal to apply § 77 principles as interpreted under the *Columbus Option* cases and the RRRA cases. The Court's conclusion, applicable to the evaluation of "prejudice" in the situation at bar, is perhaps best articulated as follows:

"The usual rule has been '[w]here only property rights are involved, mere postponement of the judicial inquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.'" (*Mitchell v. W. T. Grant*, 416 U.S. 600, 611, 94 S.Ct. 1895, 1902, 40 L.Ed.2d 406, 416 (1974)).

Analogously, the delay in receiving compensation created by the invasion of the funds is justified by the ultimate resort to judicial process.

---

15. The escrow fund is, of course, identified and identifiable and can, presumably, be traced.

In addition, of course, there is present the factor of smooth transition, unfettered by crises of cash deficits that would impede or even cause cessation of essential railroad operations. In a sense, there is a substitution for the probability of reorganization under the *Columbus Option* cases, *supra,* by the transition period of a realized reorganization.

■ Aside from the circumstances of the Ann Arbor itself, and the record this Court has regarding them, concern must also be evidenced as to the Ann Arbor's role, however small, in the over-all scheme contemplated by Congress and embodied in the Final System Plan. At the cost of being redundant, the Congress was faced with a critical situation and chose, in its wisdom, a course that attempts to balance private and public interests without derogating the constitutional rights of the private interests.

The creditors, relying on this Court's § 77 equitable discretion, ask the Court to refuse to apply the funds to § 211(h)(1) debts. However, an exercise of reasoned discretion assumes viable alternatives, and this Court discerns no such alternative in this case. Certainly, the use of § 211(h)(1) super-priority loans is not a suitable substitute for use of the subject funds. Therefore, this Court feels constrained to exercise its discretion to compel invasion of the funds.

Inasmuch as the operation of § 211(h) satisfies the requisites of § 77, this Court concludes that § 211(h) may properly be read in conjunction with § 77 and that the term "cash and other current assets" includes those secured monies permissibly invaded pursuant to § 77.

Despite this Court's firm belief that the operation of the RRRA permits invasion of the liened escrow fund, it is neither unmindful of nor insensitive to a number of counterveiling considerations. Foremost among those considerations is the force of the strict legislative intent approach. In selecting the phrase "cash and current as-

sets," Congress utilized a term with a pre-existing and conventional meaning. Moreover, the failure to define the term and the patent lack of consideration of its import provide a basis for arguing that the term is limited to its technical definition.[16] Certainly, Congress could and did express a specific intent to override secured interests elsewhere in the statute (§ 303). Its failure to do so explicitly in § 211(h) may be construed as some evidence of an intent to exclude liened funds designated as long-term accounts. Certainly, also, it may be argued that such restructuring of creditors' rights should only be accomplished by an unambiguous legislative command. However, this Court, though disapproving of the absence of explicit consideration, feels that prior judicial construction as well as the statutory framework, provide the proper perspective from which to assess § 211(h).

■ Moreover, this Court entertains some reservations concerning the policy of the Act. Its persistent equation of the public interest with continued rail operations, at an acknowledged cost to the estates and creditors, overlooks other potentially compelling policy considerations. In particular, governmental payment of current expenses incurred by reason of *governmentally mandated* rail operations, would be an equitable means of minimizing railroad operating deficits. The failure to provide fully for those deficits, and the consequent burden on creditors, may well serve to discourage the extension of credit to ConRail. In the view of this Court, such a result, if detrimental to ConRail, could prove to be seriously counterproductive to the long-range public interest. Nevertheless, the role of this Court is not to re-shape the policy dictates of the Act, but to effectuate faithfully those policy decisions made by Congress. Accordingly, it is constrained to compel application of the escrow funds to § 211(h)(1) obligations.

IT IS SO ORDERED.

Appendices A, B and C follow.

---

16. This Court views the failure of the interested parties to alert Congress to the magnitude of the obvious escrow problem facing all of the railroads with a considerable degree of puzzlement.

## APPENDIX A

## RAILROAD REVITALIZATION ACT

### SECTION 211(h)

"(h) *Loans for Payment of Obligations.* —(1) The Association is authorized, subject to the limitations set forth in section 210(b) of this title, to enter into loan agreements, in amounts not to exceed $230,000,000 in the aggregate, with the Corporation, the National Railroad Passenger Corporation, and any profitable railroad to which rail properties are transferred or conveyed pursuant to section 303(b)(1) of this Act, under which the Corporation, the National Railroad Passenger Corporation, and any profitable railroad entering into such agreement will agree to meet existing or prospective obligations of the railroads in reorganization in the region which the Association, in accordance with procedures established by the Association, determines should be paid by the Corporation, the National Railroad Passenger Corporation, or a profitable railroad, on behalf of the transferors, in order to avoid disruptions in ordinary business relationships. Such obligations shall be limited to amounts claimed by suppliers (including private car lines) of materials or services utilized in current rail operations, claims by shippers arising from current rail services, payments to railroads for settlement of current interline accounts, claims of employees arising under the collective bargaining agreements of the railroads in reorganization in the region and subject to section 3 of the Railway Labor Act, claims of all employees or their personal representatives for personal injuries or death and subject to the provisions of Employers' Liability Acts (45 U.S.C. 51–60), and amounts required for adequate funding of accrued pension benefits existing at the time of a conveyance or discontinuance of service under employee pension benefit plans described in section 505(a) of this Act. The Association shall not make such a loan unless it first finds·that the loan is for the purpose of paying obligations with respect to accrued pension plans referred to in the preceding sentence or that the Corporation, the National Railroad Passenger Corporation, or a profitable railroad is entitled to a loan pursuant to subsections (e) and (g) of section 504 of this Act, or unless it first finds that—

"(A) provision for the payment of such obligations was not included in the financial projections of the final system plan;

"(B) such obligations arose from rail operations prior to the date of conveyance of rail properties pursuant to section 303(b)(1) of this Act and are, under other applicable law, the responsibility of a railroad in reorganization in the region;

"(C) the Corporation, the National Railroad Passenger Corporation, or a profitable railroad has advised the Association that the direct payment of such obligations by the Corporation, the National Railroad Passenger Corporation or profitable railroad is necessary to avoid disruptions in ordinary business relationships;

"(D) the transferor is unable to pay such obligations within a reasonable period of time; and

"(E) with respect to loans made to the Corporation, the procedures to be followed by the Corporation, in seeking reimbursement from the railroads in reorganization in the region for obligations paid on their behalf under this subsection, have been jointly agreed to by the Finance Committee and the Corporation.

"(2) The trustees of each railroad in reorganization in the region shall attempt to negotiate agency agreements with the Corporation, the National Railroad Passenger Corporation, or a profitable railroad for the processing of all accounts receivable and accounts payable attributable to operations prior to the conveyance of property pursuant to section 303(b)(1) of this Act. If any railroad in reorganization in the region fails to conclude such an agreement within a reasonable time prior to such conveyance, the applicable reorganization courts, after giving all parties an opportunity to be heard, shall prescribe the terms of such an agency arrangement by order, giving due consideration to the need, wherever possi-

ble, to make such agreements uniform among the various estates.

"(3) The Association may, not less than 30 days prior to the date of conveyance pursuant to section 303(b)(1) of this Act, petition each district court of the United States having jurisdiction over the reorganization of a railroad in reorganization in the region for an order, which shall be entered prior to such conveyance, and which—

"(A) identifies that cash and other current assets of the estate of such railroad which shall be utilized to satisfy obligations of the estates identified in paragraph (1) of this subsection; and

"(B) provides for the application by the trustees of such railroads and their agents, consistent with the principles of reorganization under section 77 of the Bankruptcy Act (11 U.S.C. 205) and with the agency agreement specified in paragraph (2) of this subsection, of all such current assets, including cash available as of or subsequent to such date of conveyance, to the payment in the postconveyance period of the obligations of the estates identified in paragraph (1) of this subsection.

"(4)(A) Each obligation of a railroad in reorganization in the region which is paid with financial assistance under paragraph (1) of this subsection shall be processed, on behalf of such railroad, by the Corporation, the National Railroad Passenger Corporation, or a profitable railroad, whichever is appropriate. An obligation of a railroad in reorganization in the region shall be paid, on behalf of such railroad, by the Corporation, the National Railroad Passenger Corporation, or a profitable railroad, whichever is appropriate, if—

"(i) such obligation is deemed by the Corporation, the National Railroad Passenger Corporation, or a profitable railroad, whichever is appropriate, to have been, on the date of conveyance of rail properties pursuant to section 303(b)(1) of this Act, the obligation of a railroad in reorganization in the region;

"(ii) such obligation accrues after such date of conveyance but as a result of rail operations conducted prior to such date, and the trustees of such railroad in reorganization acknowledge that it is an obligation of such railroad; or

"(iii) the district court of the United States having jurisdiction over such railroad in reorganization in the region approves such obligation as a valid administrative claim against such railroad; to the extent that payment is required under a loan agreement with the Association under such paragraph (1).

"(B) The Association shall resolve any disputes among the Corporation, the National Railroad Passenger Corporation, and a profitable railroad concerning which of them shall process and pay any particular obligation on behalf of a particular railroad in reorganization.

"(C) The Corporation, the National Railroad Passenger Corporation, or a profitable railroad shall have a direct claim, as a current expense of administration, for reimbursement from the estate of a railroad in reorganization in the region for all obligations of such estate (plus interest thereon) which are paid by the Corporation, the National Railroad Passenger Corporation, or a profitable railroad, as the case may be. The right of the Corporation or the National Railroad Passenger Corporation to receive reimbursement under this subparagraph from the estate of a railroad in reorganization in the region shall be reduced by the amount, if any, of loans, plus interest forgiven under paragraph (5) of this subsection.

"(5)(A) If, at any time, the Finance Committee of the Association determines that the failure of the Corporation to receive full reimbursement with interest from the estate of a railroad in reorganization in the region for any obligation of such estate paid pursuant to this subsection could adversely affect the fairness and equity of the transfers and conveyances pursuant to section 303(b)(1) of this Act, or that the failure of the National Railroad Passenger Corporation to receive such full reimbursement

plus interest for any such obligation would be contrary to the public interest, the Association shall forgive the indebtedness, plus accrued interest, of the Corporation or of the National Railroad Passenger Corporation incurred pursuant to paragraph (1) of this subsection in the amount recommended by the Finance Committee. The Association shall have a direct claim, as a current expense of administration of the estate of such railroad in reorganization, equal to the amount by which loans of the Corporation or of the National Railroad Passenger Corporation, plus interest, have been forgiven. Such direct claim shall not be subject to any reduction by way of setoff, cross-claim, or counter-claim which the estate of such railroad in reorganization may be entitled to assert against the Corporation, the National Railroad Passenger Corporation, the Association, or the United States.

"(B) The direct claim of the Association under this paragraph, and any direct claim authorized under paragraph (4) of this subsection, shall be prior to all other administrative claims of the estate of a railroad in reorganization, except claims arising under trustee's certificates or from default on the payment of such certificates.

"(6) Notwithstanding any other provision of this subsection, the Association shall forgive any loan made to the Corporation or the National Railroad Passenger Corporation pursuant to this subsection, plus accrued interest thereon, on the 3rd anniversary date of any such loan, except that the Association shall not forgive any loan or portion thereof, in accordance with this paragraph, if—

"(A) the Finance Committee makes an affirmative finding, with respect to such loan or portion thereof, that—

"(i) the Corporation has not exercised due diligence in executing the procedures adopted pursuant to paragraph (1)(E) of this subsection, and

"(ii) the failure of the Association to forgive such loan or portion thereof will not adversely affect the ability of the Corporation to become financially self-sustaining;

"(B) the Finance Committee so directs the Association; and

"(C) neither House of the Congress disapproves such affirmative finding and direction, in accordance with the following provisions of this paragraph.

A copy of each such finding, the reasons therefor, and such direction made by the Finance Committee, together with the comments and recommendations thereon of the Board of Directors of the Association, shall be transmitted to the Congress by the Association within 10 days after the date on which the Finance Committee makes such finding and direction, or if not so transmitted, shall be transmitted by the Finance Committee. Each such finding and direction so transmitted shall become effective immediately, and shall remain in effect, unless, within the first period of 30 calendar days of continuous session of Congress after the date of transmittal of such finding and direction to Congress, either House of Congress disapproves such finding and direction in accordance with the procedures specified in section 1017 of the Congressional Budget and Impoundment Control Act of 1974 (31 U.S.C. 1407). For purposes of this paragraph, continuity of session of Congress is broken only in the circumstances described in section 1011(5) of that Act (31 U.S.C. 1401(5)).

"(7) For purposes of this subsection, the term 'Corporation' includes a subsidiary of the Corporation.

"(i) *Electrification.*—Upon application by the Corporation, the Secretary shall, pursuant to the provisions of and within the obligational limitations contained in sections 511 through 513 of the Railroad Revitalization and Regulatory Reform Act of 1976, guarantee obligations of the Corporation for the purpose of electrifying high-density mainline routes if the Secretary finds that such electrification will return operating and financial benefits to the Corporation and will facilitate compatibility with existing or renewed electrification systems. The aggregate unpaid principal amount of obligations which may be guaranteed by the Secretary under this para-

graph shall not exceed $200,000,000 at any one time."

## APPENDIX B

### 45 U.S.C., RAILROADS

### § 743. VALUATION AND CONVEYANCE OF RAIL PROPERTIES.

"(a) *Deposit with court.*—Within 10 days after delivery of a certified copy of a final system plan pursuant to section 719(c) of this title—

"(1) the Corporation, in exchange for the rail properties of the railroads in reorganization in the region and of railroads leased, operated, or controlled by railroads in reorganization in the region to be transferred to the Corporation, shall deposit with the special court all of the stock and other securities of the Corporation and obligations of the Association designated in the final system plan to be exchanged for such rail properties;

"(2) each profitable railroad operating in the region purchasing rail properties from a railroad in reorganization in the region, or from a railroad leased, operated, or controlled by a railroad in reorganization in the region, as provided in the final system plan shall deposit with the special court the compensation to be paid for such rail properties.

"(b) *Conveyance of rail properties.*—(1) The special court shall, within 10 days after deposit under subsection (a) of this section of the securities of the Corporation, obligations of the Association, and compensation from the profitable railroads operating in the region, order the trustee or trustees of each railroad in reorganization in the region to convey forthwith to the Corporation and the respective profitable railroads operating in the region, all right, title, and interest in the rail properties of such railroad in reorganization and shall itself order the conveyance of all right, title, and interest in the rail properties of any railroad leased, operated, or controlled by such railroad in reorganization that are to be conveyed to them under the final system plan as certified to such court under section 719(d) of this title.

"(2) All rail properties conveyed to the Corporation and the respective profitable railroads operating in the region under this section shall be conveyed free and clear of any liens or encumbrances, but subject to such leases and agreements as shall have previously burdened such properties or bound the owner or operator thereof in pursuance of an arrangement with any State, or local or regional transportation authority under which financial support from such State, or local or regional transportation authority was being provided on January 2, 1974, for the continuance of rail passenger service or any lien or encumbrance of no greater than 5 years' duration which is necessary for the contractual performance by any person of duties related to public health or sanitation. Such conveyances shall not be restrained or enjoined by any court.

"(3) Notwithstanding anything to the contrary contained in this Act, if railroad rolling stock is included in the rail properties to be conveyed, such conveyance may only be effected if the profitable railroad operating in the region or the Corporation to whom the conveyance is made assumes all of the obligations under any conditional sale agreement, equipment trust agreement, or lease in respect to such rolling stock and such conveyance is made subject thereto; and the provisions of this chapter shall not affect the title and interests of any lessor, equipment trust trustee, or conditional sale vendee or assignee under such conditional sale agreement, equipment trust agreement or lease under section 205(j) of Title 11.

"(4) Notwithstanding anything to the contrary contained in this chapter, if a railroad in reorganization has leased rail properties from a lessor that is neither a railroad nor controlled by or affiliated with a railroad, and such lease has been approved by the lessee railroad's reorganization court prior to January 2, 1974, conveyance of such lease may only be effected if the Corporation or the profitable railroad to whom the conveyance is made assumes all of the terms and conditions specified in the lease,

including the obligation to pay the specified rent to the nonrailroad lessor.

"(c) *Findings and distribution.*—(1) After the rail properties have been conveyed to the Corporation and profitable railroads operating in the region under subsection (b) of this section, the special court, giving due consideration to the findings contained in the final system plan, shall decide—

"(A) whether the transfers or conveyances—

"(i) of rail properties of each railroad in reorganization, or of each railroad leased, operated, or controlled by a railroad in reorganization, to the Corporation in exchange for the securities and the other benefits accruing to such railroad as a result of such exchange, as provided in the final system plan and this chapter, and

"(ii) of rail properties of each railroad in reorganization, or of each railroad leased, operated, or controlled by a railroad in reorganization, to a profitable railroad operating in the region, in accordance with the final system plan, are in the public interest and are fair and equitable to the estate of each railroad in reorganization in accordance with the standard of fairness and equity applicable to the approval of a plan of reorganization or a step in such a plan under section 205 of Title 11, or fair and equitable to a railroad that is not itself in reorganization but which is leased, operated, or controlled by a railroad in reorganization;

"(B) whether the transfers or conveyances are more fair and equitable than is required as a constitutional minimum; and

"(C) what portion of the proceeds received by a railroad in reorganization from an entity other than the Corporation for the sale, lease, or transfer of property subject to an agreement under section 723 or section 725(a)(1) or (2) of this title reflects value attributable to the maintenance or improvement provided pursuant to the agreement.

"(2) If the special court finds that the terms of one or more exchanges for securi-

ties and other benefits are not fair and equitable to an estate of a railroad in reorganization, or to a railroad leased, operated, or controlled by a railroad in reorganization, which has transferred rail properties pursuant to the final system plan, it shall—

"(A) enter a judgment reallocating the securities of the Corporation in a fair and equitable manner if it has not been fairly allocated among the railroads transferring rail properties to the Corporation; and

"(B) if the lack of fairness and equity cannot be completely cured by a reallocation of the Corporation's securities, order the Corporation to provide for the transfer to the railroad of other securities of the Corporation or obligations of the Association as designated in the final system plan in such nature and amount as would make the exchange or exchanges fair and equitable; and

"(C) if the lack of fairness and equity cannot be completely cured by reallocation of the Corporation's securities or by providing for the transfer of other securities of the Corporation or obligations of the Association as designated in the final system plan, enter a judgment against the Corporation.

"(3) If the special court finds that the terms of one or more conveyances of rail properties to a profitable railroad operating in the region in accordance with the final system plan are not fair and equitable, it shall enter a judgment against such profitable railroad. If the special court finds that the terms of one or more conveyances or exchanges for securities or other benefits are fairer and more equitable than is required as a constitutional minimum, then it shall order the return of any excess securities, obligations, or compensation to the Corporation or a profitable railroad so as not to exceed the constitutional minimum standard of fairness and equity.

"(4) Upon making the findings referred to in this subsection, the special court shall order distribution of the securities, obligations, and compensation deposited with it under subsection (b) of this section to the

trustee or trustees of each railroad in reorganization in the region who conveyed right, title, and interest in rail properties to the Corporation and the respective profitable railroads under such subsection."

## APPENDIX C
### H.R. 10979

"(h) *Loans for payment of obligation.* —(1) Notwithstanding any other provision of this Act, the Association may, subject to the limitation set forth in section 210(b) of this title, provide assistance in the form of loans to the Corporation, and to any profitable railroad to which rail properties are transferred or conveyed pursuant to the final system plan, in an amount adequate to enable the Corporation or such profitable railroad to meet obligations which are determined by the Association to be obligations of the transferors, and as to which obligations it is necessary for the Corporation or profitable railroad to make direct payment on behalf of a railroad in reorganization in order to permit continued orderly operations, including accrued employee benefits and claims, damages claimed by shippers, and inter-railroad payments for per diem charges and rate divisions. The Association shall make such loans to the Corporation or a profitable railroad, as the case may be, for obligations imposed because of the provision of section 504(g) of this Act. The Association shall not make such a loan unless the Association finds that—

"(A) provision for the payment of such obligation was not included in the financial projections of the final system plan;

"(B) the obligations are, under other applicable law, the responsibility of a railroad in reorganization and

"(C) the Corporation or profitable railroad has advised the Association that the direct payment of the obligations by the Corporation or profitable railroad is necessary to permit continued orderly operations.

"(2) Any obligation of a railroad in reorganization with respect to which assistance is provided pursuant to paragraph (1) shall be processed on behalf of the railroad in reorganization by the Corporation or a profitable railroad, as the case may be. Any such obligation that the Corporation or a profitable railroad deems to have been the obligation of a railroad in reorganization on the date of conveyance pursuant to section 303(b)(1) of this Act, and which such transferor acknowledges to have been its obligation or which the United States district court having jurisdiction over the reorganization of a railroad in reorganization pursuant to section 77 of the Bankruptcy Act (11 U.S.C. 205) approves for payment on behalf of such railroad in reorganization, may be paid on behalf of such transferor by the Corporation or a profitable railroad. The Association shall resolve any dispute between the Corporation and a profitable railroad with respect to which party shall process and pay any particular obligation on behalf of a particular railroad in reorganization. The Corporation or the profitable railroad shall be entitled to direct reimbursement as a current expense of administration from the estate of the railroad in reorganization on behalf of whom the obligation was paid, together with interest thereon at the rate of interest charged by the Association for the loan from which the funds for such payment were provided. Notwithstanding any other provision of law, the railroad in reorganization shall be required to apply all cash and any other current assets arising from railroad operations accrued on its books as of the date of conveyance pursuant to section 303(b)(1) to such reimbursement before any other application of such current assets. Such application shall be made in accordance with procedures established by the Association. To the extent that the Corporation or a profitable railroad fails to receive reimbursement from the estate of the railroad in reorganization within 2 years following payment, it shall be entitled to a credit and forgiveness in like amount, plus accrued interest, applied to any indebtedness incurred pursuant to paragraph (1). The Association shall have a direct claim as a current expense of administration from the estate of the railroad in reorganization equal to the amount

by which the Corporation or a profitable railroad has not been reimbursed, plus interest. Such direct claim shall not be subject to any reduction by way of setoff, cross-claim, or counterclaim which the estate of the railroad in reorganization may be entitled to assert against the Corporation, the profitable railroad, the Association, or the United States."