**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

No. 70–347.

United States District Court,
E. D. Pennsylvania.

Jan. 16, 1976.

Paul R. Duke, James E. Howard and Edwin K. Taylor, Philadelphia, Pa., for the trustees, Penn Central Transp. Co.

Sullivan & Worcester by Morris Raker, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff by Wilbur Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford Railroad Co.

Willkie, Farr & Gallagher by Louis Craco, New York City, for Institutional Investors Penn Central Group.

Ballard, Spahr, Andrews & Ingersoll by Lewis A. Grafman, Philadelphia, Pa., for indenture trustees.

David Berger, P. A., by David Berger and Daniel Berger, Philadelphia, Pa., for Penn Central Co.

James F. Dausch, Washington, D. C., for the United States.

## MEMORANDUM IN SUPPORT OF ORDER NO. 2158

FULLAM, District Judge.

As authorized by Order No. 124, the Trustees, in January of 1971, borrowed $100 million through the issuance of trustees certificates. Pursuant to the Emergency Rail Services Act of 1970, 45 U.S.C. § 661 *et seq.*, the United States, acting through the Secretary of Transportation, guaranteed payment of these certificates.

The first installment of principal, in the amount of $50 million, is due and payable January 15, 1976. The operating revenues of the Debtor have not provided the Trustees with the funds necessary for the payment of these maturing certificates. Faced with the likelihood of default by the Trustees, which would immediately trigger liability under its guarantee, the Government has filed a petition (Document No. 9697) asking this Court to direct the Trustees to pay the principal of the maturing certificates from escrowed funds derived from sales of property. By reason of further information contained in the proposals advanced by the Trustees in response to the Government's petition, the Government's position has been further refined, and it is now contended that the Trustees should use specified funds derived or derivable from subsidiaries for the purpose of making payment of the certificates.

 The Government's petition may be analogized to an attempt by a surety to obtain specific performance of its principal's agreement to pay. Under ordinary circumstances, the guarantor would find it necessary to wait until default and fulfillment of its guarantee before asserting a subrogation claim against the principal. The parties here have proceeded on the assumption that the reorganization context, involving this Court's equitable powers and general supervision of the conduct of the Trustees, justifies a different approach in this case, and I am inclined to agree. Viewed in that light, the Government's petition can be seen as an attempt by a contingent creditor whose claim would be an expense of administration to compel the Trustees to satisfy on a current basis a particular kind of administration claim, rather than defer same.

The Trustees, supported by all of the secured creditors, oppose the Government's petition, and suggest, instead, that the Trustees be directed to set aside, in escrow, the sum of $50 million subject to further order of this Court. They point out: (1) that it now appears that the Trustees will face grave, perhaps even insurmountable, cash flow problems post-conveyance,[1] and that it would be highly imprudent to expend $50 million at this time; (2) that there are many issues concerning the correct relationship between the liability represented by the trustees certificates and the Government's guarantee thereof and

---

1. *I. e.*, conveyance to Conrail of major portions of the rail system pursuant to the RRRA now scheduled to occur before March 1, 1976, but virtually certain to be postponed.

other liabilities ranking as administration claims, which cannot appropriately be resolved at this time; and (3) that adoption of the Trustees' proposals would not prejudice the interests of the Government (whose subrogation claim would be amply secured) or any other party, and would be consistent with their fiduciary obligations as Trustees.

It is clear that many parties to the reorganization proceeding contend that, notwithstanding the statutory priority accorded the trustees certificates in the Emergency Rail Services Act of 1970, 45 U.S.C.A. § 661 *et seq.*, intervening events have made it clear that, in the final analysis, the Government's claims should be subordinated to at least certain other claims, or that certain setoffs against the Government's claims should be allowed. The Trustees' suggestion that these contentions should not be foreclosed by requiring immediate payment of the trustees certificates at this time may have merit. But I consider it unnecessary to explore that suggestion in detail, since I am persuaded that the impending cash problems of the Debtor plainly require that the Government's petition be denied.

Financial projections now available are based upon the assumption that the conveyance to Conrail will take place not later than March 1, 1976. While it now seems unlikely that this assumption will prove valid, it is obvious that the problems disclosed by the existing projections will not be lessened by postponement of the conveyance date.

The Trustees' responsibilities will not end with conveyance. Assuming that they will be able to obtain adequate support for rail operations until the conveyance, the Trustees will thereafter be required to manage the surviving enterprise until the reorganization process is completed. Because of the many existing uncertainties, which are well known and need not be detailed here, it is somewhat difficult to make precise predictions as to the nature and form of the surviving entity. Preliminary planning by the Trustees, based upon what are believed to be minimum requirements, indicates that from March 1, 1976 through December 31, 1976, it is probable that the Trustees will receive approximately $15.6 million in additional cash, but will have incurred $20.4 to $25.4 million in direct operating expenses. This does not include any provision for pension obligations which, depending upon arrangements yet to be worked out with Conrail, may be substantial.

During the same period, the Trustees will be faced with a further cash problem, in that they will be required to meet current liabilities attributable to pre-conveyance operations, which will exceed current assets by approximately $230 million.

The Government recognizes the magnitude of the cash problems confronting the Trustees, but advances two lines of argument: (1) the $50 million now in dispute is too small a sum to solve the Trustees' post-conveyance problems; and (2) pending legislative proposals may provide an alternative means for the solution of these post-conveyance problems.

It is of course correct that $50 million will not totally solve a $230 million-plus problem. It is equally true that a $180 million problem is preferable to a $230 million problem. In short, the Government's first argument simply does not provide a reason for directing the Trustees to deplete the cash resources of the estate at this time.

The Government points out that legislation recently passed by Congress, but not yet submitted to the President, includes provisions which would amend the RRRA by adding thereto a § 211(h), which is addressed to the problem of post-conveyance payment of pre-conveyance current liabilities. The Trustees and creditors point out that the proposed legislation deals only with certain kinds of pre-conveyance liabilities, and that it involves many other unattractive consequences. For present purpose, it suffices to state that the legislation has not yet been enacted. In thus concluding that

**910**

the pendency of this legislation does not furnish a basis for action by this Court at this time, I intend no suggestion either way as to whether, upon passage of the legislation, it would be appropriate for this Court to cause the obligation represented by the trustees certificates to be converted into the kind of obligation contemplated by the proposed § 211(h).

Having concluded that the Trustees' ability to carry out their responsibilities would be seriously jeopardized by granting the Government's petition, and that the rights of all parties, including the Government, would be adequately protected by adoption of the Trustees' proposals, I have heretofore, on January 14, 1976, entered Order No. 2158, directing the Trustees not to pay the $50 million principal installment on the trustees certificates falling due January 15, 1976, but instead to set up an escrow fund in that amount subject to further order of the Court.