In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

In re TRUSTEES' PROPOSED COMPROMISE OF PERSONAL INJURY AND TAX CLAIMS.

No. 70–347.

United States District Court, E. D. Pennsylvania.

April 22, 1977.

As Amended April 25, 1977.

was made in response to questions not at issue. See n.9, *supra.*

Carl Helmetag, Jr., Andrew P. Corcoran, Jr., John J. Ehlinger, Jr., Philadelphia, Pa. and Covington & Burling by Charles A. Horsky, Washington, D.C., for the Trustees, Penn Cent. Transp. Co.

Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa. and Sullivan & Worcester by Morris Raker, Boston, Mass., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford R. Co.

Edith I. Spivack, Executive Asst. Corp. Counsel, New York City, for the City of New York.

John H. Broadley, Dept. of Justice, Washington, D.C., for the United States.

Paul W. Beltz, P.C. by Paul W. Beltz, Buffalo, N.Y., for Oscar Collins, Gary Gresock, James Friss, Albert Heim, and Henry Van Vugt.

Marsh, Day & Calhoun by Peter Wilkinson, Bridgeport, Conn., for Citytrust, Trustee.

Winne & Banta by Peter G. Banta, Hackensack, N.J., for Peoples Trust of New Jersey, Harlem Second Indenture Trustee.

Walsh & Frisch by E. Roger Frisch, New York City, for Mahoning Coal R. Co. and Mahoning & Shenango Valley R. Co.

Thomas P. Zolezzi, Asst. Atty. Gen., Albany, N.Y., for the State of New York.

Fell, Spalding, Goff & Rubin by Richard M. Imperatore, Philadelphia, Pa., for Ohio Prosecuting Attys. Assn.

Herbert K. Glickman, Deputy Atty. Gen., Trenton, N.J., for the State of New Jersey.

John K. Godre, Detroit, Mich., for County of Wayne, Michigan.

Carl Rashid, Jr., and Victor G. Marrocco, Detroit, Mich., for City of Detroit.

Pepper, Hamilton & Scheetz by Michael W. Freeland, Philadelphia, Pa., for Consolidated Rail Corp.

David Berger, P.A., by Daniel Berger, Philadelphia, Pa., for Penn Cent. Co.

Dan R. Pellegrini, Pittsburgh, Pa., for City of Pittsburgh.

Kelley, McCann & Livingstone by Margaret Anne Foster, Cleveland, Ohio, for Bd. of Ed., Cleveland City School District.

Jon F. Oster, Deputy Atty. Gen. of Maryland and Carl E. Eastwick, Asst. Atty. Gen. of Maryland, Baltimore, Md., for State of Maryland and certain taxing authorities of Maryland.

Bruce C. Fishelman, Jersey City, N.J., for City of Jersey City.

Ralph Feigelson, Union City, N.J., for Township of North Bergen, N.J.

George Campan, for Township of Weehawken, N.J.

Walsh & Frisch by Jerome K. Walsh, New York City, for George Betz and Robert Valimont, trustees of certain secondary debtors.

John B. Wirtz, Canton, Ohio, for Stark County, Ohio.

Ronald Glantz, Lincoln, R.I., for City of Providence, Rhode Island.

Goodman & Ewing by William H. Ewing, Philadelphia, Pa., for Fort Wayne & Jackson R.R. and trustees of secondary debtors.

Henry O. Sitler, Indianapolis, Ind., for the State of Indiana.

Susan Bring, Asst. Corp. Counsel, Buffalo, N.Y., for the City of Buffalo, N.Y.

Willkie, Farr & Gallagher by Walter H. Brown, Jr., New York City, for Institutional Investors, Penn Cent. Group.

## MEMORANDUM AND ORDER NO. 2921 AND 2922

FULLAM, District Judge.

The Trustees of the Debtor have filed a proposed Plan of Reorganization. A major aspect of the Plan is the treatment accorded the very large highest priority administration claims of the United States. After extensive discussions, the United States and the Trustees agreed to a method for treating the Government's claims which adequately protects the interest of the United States, and also permits the Trustees to propose a plan now, rather than some undetermined number of years in the future. A condition of the agreement is that the Trustees offer to compromise certain tax and personal injury claims.[1] Before the Court are two petitions of the Trustees for authority to effectuate the compromise of those claims.

The first petition seeks leave to pay, in cash, all personal injury claims which have thus far been liquidated, or which may hereafter be liquidated within a period of 180 days (or such further period as the Trustees, in their discretion, may authorize, or this Court may direct); claims in excess of $5,000 would be paid off in installments over a period of 18 months. It is estimated that approximately $11,952,830 would be required for this purpose, $3,460,124 immediately.[2]

The second petition, which has engendered more controversy, seeks permission to extend to all state and local taxing authorities an offer to compromise all outstanding tax claims by paying, in cash, 50% of the unpaid taxes which have accrued since the filing of the reorganization petition. Each taxing authority would be completely free to refuse the settlement offer, in which case its claims would be dealt with in the Reorganization Plan. Since post-petition taxes aggregate approximately $340 million, the maximum amount of cash which might be required to carry out the compromise settlement program would be approximately $170 million.

The cash needed immediately to carry out both proposals would be obtained primarily by transfers from certain existing escrow accounts, including a $50 million escrow account previously established in connection with matured trustees certificates, unrestricted funds of the estate, and accounts containing proceeds from sales of real and personal property. The deferred installments of the personal injury payments appear manageable from cash flow, as projected (for the most part, proceeds from future sales of property).

In addition to the United States Government, most of the secured creditors have supported both petitions. Certain leased line and equivalent interests have expressed either approval of, or neutrality toward, the merits of the Trustees' proposals, but object to the proposed allocation of the burden as

---

1. The agreement was submitted for this Court's preliminary approval (Doc. No. 11768), and after hearing I entered Order No. 2744 which granted such preliminary approval.

2. The additional amount necessary to satisfy unliquidated personal injury claims is estimated to be $3 million. A significant number of personal injury claimants have filed their claims late. To the extent such claimants are permitted to participate, there will be an increase in the amount of funds necessary to carry out the present proposal.

among the various possible sources of cash. The principal objections to the merits of both proposals were expressed by certain taxing entities, and by Amtrak.

Briefly, a number of taxing authorities object to the payment of any personal injury claims unless all tax claims are first paid in full; and they object to the proposed tax compromise program on a variety of grounds. These objections, which will be discussed in detail in Part IV below, range from assertions that all taxes should be paid in cash immediately, and that the existing restraints against enforcement of tax liens should now be lifted, to the assertion that the compromise proposal unfairly discriminates between taxing authorities in the same category, or unfavorably discriminates against taxing authorities which are precluded by state law from agreeing to compromise settlements. In addition, many of the taxing authorities contend that the merits of the treatment of tax claims in the proposed Plan of Reorganization should be addressed at this time, so that the taxing authorities will be in a position to decide whether or not to accept the proposed compromise. Amtrak urges that the Trustees' proposals unfairly favor the taxing authorities and personal injury claimants.

Hearings on both petitions were held on February 25, 1977. Because the relationship between the present petitions and the proposed Plan of Reorganization must be clearly understood, and because a large number of persons and entities legitimately concerned may not have a clear perception of the issues involved or of the context in which they arise, a complete and detailed analysis and discussion appears desirable, even at the risk of indulging in what those who have been intimately involved in these reorganization proceedings from the outset may consider repetition.

## I. The Background and Current Status of the Reorganization Proceedings

Because the present petitions have their origin in the agreement between the United States and the Trustees, it is appropriate to review the course of these proceedings from the perspective of the United States involvement. It is fair to state that the role of the United States in the Debtor's reorganization is unprecedented. The Trustees' Reorganization Plan and the present petitions are at least as much a product of the involvement of the United States as of the underlying economic facts. The two primary legislative enactments through which the United States has participated in this case are the Emergency Rail Services Act of 1970 [3] and the Regional Rail Reorganization Act of 1973, as amended.[4]

At the outset of the case, the Trustees were confronted with an unmanageable cash shortage which they were unable to alleviate through private-sector borrowing. In response to the imminent threat of cessation of rail operations, the Congress enacted the Emergency Rail Services Act of 1970. Under this Act, the Secretary of Transportation was authorized to guarantee trustees certificates. The guarantee permitted the Trustees to sell $100 million of trustees certificates in the private market.[5] In accordance with the Act, the trustees certificates were accorded the highest lien on the property of the estate.[6]

Although there were some improvements in the financial results during the ensuing years, it became clear in 1973 that there could be no conventional reorganization, and that the Constitution required the termination of the Debtor's rail operations. Faced with this crisis, the Congress enacted the Regional Rail Reorganization Act, effective January 2, 1974. In broad outline, the RRRA was quite simple. A planning

---

**3.** 45 U.S.C. §§ 661 *et seq.*

**4.** 45 U.S.C. §§ 701 *et seq.*

**5.** *See In re Penn Central Trans. Co. (Issuance of Trustees Certificates),* 325 F.Supp. 302 (E.D. Pa.1971).

**6.** The nature of the lien of the trustees certificates is discussed in *In re Penn Central Trans. Co. (Columbus Option),* 494 F.2d 270 (3d Cir. 1974) and *In re Penn Central Trans. Co. (Pennco Settlement Agreement),* 358 F.Supp. 154, 175 (E.D.Pa.1973).

agency, USRA, was to analyze the operation of all bankrupt rail carriers in the Northeast and select from those lines a new system which would eventually be profitable; the selected lines were to be conveyed to a new for-profit company—ConRail; and the bankrupt carriers were to be compensated for their property with stock of the new company. On April 1, 1976, Penn Central and the other bankrupt carriers conveyed their rail assets to ConRail, and ConRail has operated the properties since that time.

Compensation of the estates with stock of the new company and the method of establishing the value of the properties conveyed to ConRail presented fundamental problems. The Act dealt with the procedural aspects by creating a new Special Court which was to decide issues relating to the value of the properties conveyed and the compensation paid. In the event that the value of the stock was less than the value of the properties conveyed, the Special Court was authorized to enter a deficiency judgment against ConRail. By definition, however, that deficiency judgment would be virtually valueless. Constitutional challenges to the Act based essentially on the fact that the deficiency judgment would be valueless were rejected by the Supreme Court on the theory that if a valueless deficiency judgment were to be entered, the estates would have a Tucker Act remedy against the United States for the shortfall.[7]

In February of 1976, Congress amended the RRRA to provide that USRA was to issue to the bankrupt carriers certificates of value guaranteed by the Secretary of Treasury.[8] The certificates are redeemable on December 31, 1987, or such earlier time as USRA may determine. In general, the certificates of value are a promise by the United States to pay to the holders the net liquidation value of the holders' conveyed

property as found by the Special Court, less the value of the ConRail stock and any dividends paid thereon, as of the redemption date, together with interest. The certificates of value, therefore, operate as a mechanism for reducing the likelihood that resort to the Tucker Act action in the Court of Claims will become necessary. It is important to note, however, that the certificates of value may or may not cover the compensation required by the Constitution, as determined by the Special Court; hence, an eventual Tucker Act action in the Court of Claims remains a possibility.

Implementation of the RRRA presented another significant difficulty: continuation of rail operations from enactment date of the RRRA until conveyance of the properties to ConRail. Even with the deferral of local taxes, leased line rents, and other operating expenses, the revenue from the operations of the bankrupt Northeast carriers was inadequate to meet operating expenses. Congress dealt partially with this cash problem. Under § 215 of the Act, loans were made to the estates to do certain types of work which resulted in the upgrading of the carriers' property, and cash grants under § 213 were available to meet unavoidable cash deficiencies. The funds appropriated for §§ 213 and 215 were less than the aggregate need of the bankrupt carriers. Therefore, the Trustees of each carrier were required to "cash manage." What this meant was that as the conveyance date approached, the bankrupt's payables were not paid. Of course, the effect of this was to place the burden of continued operations on the private sector, vendors of services and supplies. Congress in turn addressed this problem by adding § 211(h) to the RRRA.[9] Under § 211(h), USRA was authorized to loan money to ConRail to pay certain of the Debtor's accounts payable. The estates are obliged to repay these § 211(h)

7. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

8. Railroad Revitalization and Regulatory Reform Act of 1976 § 610(b), 45 U.S.C. § 746 (1976) (originally enacted as Pub.L. No. 94–210).

9. Railroad Revitalization and Regulatory Reform Act of 1976 § 606, 45 U.S.C. § 721(h) (1976) (originally enacted as P.L. 94–210).

expenditures, and ConRail and/or USRA hold highest priority administration claims against the estates for the unpaid balances of § 211(h) advances. The Trustees estimate that the estate's § 211(h) obligations will be approximately $290 million.

In connection with the implementation of § 211(h) a dispute arose as to whether accrued vacation liabilities totaling approximately $60 million were obligations of the estate that should be paid by § 211(h) funds or obligations of ConRail as the successor employer. I held that ConRail was obligated to discharge the accrued vacation obligations.[10] While an appeal from that decision was pending, Congress amended the RRRA to provide that vacation pay was an obligation of the estate.[11] Arguably then, an additional $60 million will be added to the Trustees' § 211(h) obligations. Moreover, the Trustees have defaulted on $50 million in trustees certificates, and as a result the United States has honored its guarantee.[12] The total claim of the United States, which under the Emergency Rail Services Act and the RRRA is entitled to be accorded first priority of all claims, is therefore between $340 million and $400 million. Arguably, some portion of this might be set off or "netted" against an eventual Tucker Act claim; but as to the major share thereof, the § 211(h) advances, Congress has expressly proscribed setoffs.

The cumulative impact of the Government's involvement in this case has created an extraordinary situation. All the estate's rail-related property and equipment has been conveyed to ConRail free and clear of liens. It is this property which was the security for the vast majority of the estate's secured creditors, including taxing authorities. Although stock in ConRail and certificates of value will be paid to the Trustees for the rail assets, no matter when the value is determined, it is possible that the stock of ConRail will not reach a value equal to the value of the conveyed property at any time prior to the 1987 redemption date. In addition, because of the priority status of the Government's claim, money now held in escrow for the benefit of bondholders and taxing authorities as well as any additional money received from future sales of property is not available for use in connection with a plan or otherwise to pay creditors. Finally, if the Court of Appeals were to reverse this Court's holding that escrow funds were not "cash or other current assets" for the purpose of § 211(h), the escrow funds would have to be used to satisfy the estate's § 211(h) obligations.

Thus, from the standpoint of the other creditors (including particularly the tax claimants) the Government's involvement in this case can be seen as achieving the goal of protecting continued rail operations by exacting a high price, namely, subordination of other secured claims to the massive new debt obligations of the Government, unavailability of liquid resources for use in carrying out a plan of reorganization which would satisfy the claims of creditors, and potential deferral of the time when a reorganization plan could sensibly be proposed. Indeed, many of the taxing authorities have stressed these arguments in the present proceeding.

In apparent recognition of the potential unfairness inherent in the situation, Congress has authorized the Secretary of Transportation to permit the use of escrow funds for purposes other than payment of the priority claims of the Government, pursuant to a plan of reorganization which, in the judgment of the Secretary, provides adequate protection for the interests of the United States.[13] It was against this background that the negotiations between the United States and the Trustees have been carried out. In general terms, the Plan

---

**10.** *In re Penn Central Trans. Co. (In re Determinations Under §§ 211(h)(2) and 211(h)(3) of the Rail Act),* 411 F.Supp. 1079 (E.D.Pa.1976).

**11.** Rail Transportation Improvement Act § 203, 45 U.S.C. § 721(h)(1)(A)(iv) (1976) (originally enacted as P.L. 94–555).

**12.** *See In re Penn Central Trans. Co. (Default on Trustees Certificates),* 406 F.Supp. 907 (E.D. Pa.1976).

**13.** 45 U.S.C. § 721(h)(4)(D)(ii).

provides that instead of receiving cash, the United States will receive various interest-bearing securities secured by specified assets of the estate. The maturity dates of these securities vary, but would produce a result which the Trustees apparently find acceptable. The Secretary of Transportation has made the required finding that the proposed Plan, embodying this securities package, does adequately protect the interests of the United States.[14]

## II. *The Proposed Plan*

A review of the broad outlines of the Plan of Reorganization proposed by the Trustees is helpful to an understanding of the issues now before the Court. But it must be emphasized that, until the hearings on the proposed Plan have been held, no question concerning the fairness and equity of the proposed Plan, or its feasibility, can be addressed. Thus, nothing which is said herein concerning the proposed Plan is intended to express any view as to the merits of the proposed Plan, nor should it be so understood.

The proposed Plan contemplates a surviving corporation which would own and manage assets in three broad categories: (1) the claim arising from the conveyance of the railroad assets to ConRail (the "valuation case"); (2) retained assets, many of which are to be sold over time pursuant to an asset-disposition program; and (3) the earnings of profitable subsidiaries which are to be retained as going concerns (primarily the Pennsylvania Company or "Pennco"). Securities to be issued by the reorganized company are designed to reflect these differences, in terms of both the source and the timing of ultimate payment; and are to be distributed to the creditors in accordance with the nature and priority of their respective interests as classified in the Plan. The proposed distribution reflects certain proposed compromise adjustments of claims in addition to the Government compromise outlined above.

This is not the place to comment upon the objections to the Plan which have been expressed to date, except to note that a list of the formal objections together with a brief one- or two-sentence description of each objection covers more than 50 closely typed pages. It is fair to assume that the interested parties are actively preparing for the forthcoming hearings by further studying both the Plan and the objections in order to identify and classify the genuinely disputed issues of fact and law which the Court will be called upon to resolve.

From the standpoint of each class of creditors, the overriding issues presumably will be whether (1) the compromise with the United States has presented an opportunity which should not be lost; (2) the Trustees' Plan accords fair treatment; and (3) if not, in the creditors' judgment what modification to the Plan is necessary to achieve fair treatment.

## III. *The Status of Tax Claims*

As of December 31, 1976, the Debtor's total unpaid liability for property taxes was $326,905,986.18, and for unpaid corporate taxes $54,276,289.91, making a total unpaid tax liability of $381,182,276.09. Of these amounts, $43,864,135.58 of property taxes and $1,923,839.21 of corporate taxes, for a total of $45,787,974.79, were regarded by the Trustees as constituting pre-bankruptcy obligations. Thus, according to the Trustees' records, $335,394,301.30 was the amount of unpaid post-bankruptcy tax liabilities as of December 31, 1976. The amounts stated do not reflect interest or penalties, nor does the present record permit a breakdown as between taxes assessed against properties conveyed to ConRail and properties retained by the Debtor, nor as between properties owned in fee by lessors and property owned in fee by the Debtor, nor as between properties which have been sold in the course of reorganization and properties still owned by the Debtor's estate.

14. The United States has, however, asserted an objection to the treatment in the Plan of certain of its other claims against the estate (Doc. No. 12765).

Because these tax liabilities have been imposed under a wide variety of state and local tax legislation, there may be minor variations in the precise nature and legal ramifications of these tax claims, but it seems safe to assume that at least the post-bankruptcy taxes rank as claims of administration. Presumably, also, the pre-bankruptcy tax obligations for the most part rank as secured claims of some kind, and probably prime most other secured obligations. It should be noted, also, that the dividing line between pre-bankruptcy and post-bankruptcy tax liabilities may be difficult to draw in particular cases.

Until now, the straitened circumstances of the Debtor's estate have not permitted payment of tax liabilities. Although the Trustees have recently petitioned this Court for leave to pay taxes on a current basis for the year 1977 and thereafter, there are insufficient free resources available to permit any significant payments of overdue liabilities, unless the settlement with the Government is carried out.

It is true that, at the present time, there are substantial amounts of money on deposit in various escrow accounts controlled by the Trustees, and that, to the extent that these funds were derived from sales of real property, various taxing authorities have liens against the funds in the amount of the unpaid taxes attributable to those particular properties. But substantially all of these funds are also subject to other liens, and all are subject to the overriding lien held by the Government.

■ It is also true that, at least with respect to taxes attributable to properties not conveyed to ConRail, liquidation would ultimately produce enough money to pay those tax claims in full. But, in bankruptcy, no one creditor or group of creditors, even administration-level claimants, can insist upon liquidation if reorganization is justified—a question which will be decided in connection with the Plan hearings. Moreover, an orderly liquidation would not provide payment in the immediate future.

It also bears emphasis that, because of the novelty of the legislative approach to the problems generated by the bankruptcies of the northeastern railroads, the Debtor's present situation is unique in the annals of bankruptcy. Thus, there are many potential opportunities for litigating novel questions of law, which might well preclude immediate satisfaction of tax claims. What is the impact of the RRRA upon the "personal" liability of the Trustees for taxes? What are the implications of the marshalling doctrine in this context? What is the status of a tax claim secured by assets which are to be paid for in ConRail securities?

In short, the taxing authorities, notwithstanding the high ranking to which their claims entitle them, will have business judgments to make.

## IV. *Validity of Objections to the Tax Compromise Proposal*

■ Some of the arguments advanced in opposition to the Trustees' tax compromise proposal are plainly lacking in merit and require no extended discussion. I am persuaded that the Trustees have the power to compromise claims, with the approval of the Reorganization Court; and that the Reorganization Court has jurisdiction and authority to permit such compromises. And I am not convinced that the alleged lack of legal authority under state law for some taxing entities to compromise tax claims is a valid reason for precluding other taxing entities under no such disability from compromising their tax claims if they wish to do so. If a particular taxing entity lacks legal authority to carry out the compromise proposal, it will presumably not accept the Trustees' offer. Assuming there may be taxing entities which would like to accept the Trustees' offer, but are precluded by state law from doing so, their complaints go to the efficacy of the state law in question, and not to the fairness or desirability of the Trustees' tax compromise proposal.

There are, however, more substantial objections which have been raised against approval of the Trustees' proposal. One such objection is the assertion that the offer is

essentially unfair because it is discriminatory, and would result in unequal treatment of claimants in the same class. Another objection is that the offer is unfair because the taxing entities do not have a basis for informed judgment.

## A. *Discriminatory Impact*

■ A few of the taxing entities charge that the Trustees' proposal is discriminatory because it contemplates payment in full of all post-petition tax claims which do not exceed $10,000 in amount. I am persuaded that this is not a valid objection. The benefits to the estate from elimination of numerous small claims seem self-evident. Moreover, in view of the small amounts involved, offering such claimants a choice between accepting 50% and pursuing their claims under the Reorganization Plan would, as a practical matter, not give them much of a choice. The Trustees' proposal to pay these small claims in full conforms to the universal practice in such situations.

■ A more significant objection is that, since the Trustees would offer to pay 50% of post-petition taxes only in exchange for release of all tax claims, both pre-petition and post-petition, the offer would necessarily be more generous as to some claimants than others. Because of differences in local laws and tax collection practices, some jurisdictions have virtually no pre-petition tax claims, while others have substantial pre-petition tax claims. The record suggests, for example, that there are no claims for pre-bankruptcy real estate taxes in the District of Columbia or in the States of Maryland, Kentucky and West Virginia. Only about 1% of the tax claims emanating from the State of New York are in the pre-bankruptcy category. At the other extreme, nearly one-third of the total tax claims arising in Indiana, and about 25% of the tax claims emanating from the State of Ohio, are in the pre-bankruptcy category. Thus, if Indiana were to accept the compromise offer, it would receive approximately $14.8 million in exchange for release of claims totaling $40.6 million, whereas Maryland would receive approximately $6.1 million in exchange for releasing claims totaling $12.1 million.

Stated otherwise, payment of 50% of the post-petition taxes would result in payment of 50% of all tax claims in some states, but would represent payment of only 36% or 37% in other states.

Everyone agrees that it would be impermissible for this Court to require similarly situated taxing entities to accept such disparate treatment, either in a plan of reorganization or otherwise. The Trustees point out, however, that any tax claimant which feels that the proposed settlement offer is unfair is at liberty to reject it.

The Trustees' insistence upon expressing the compromise offer in terms of payment of a portion of the post-petition tax claims is understandable, and sound. Only post-petition claims are clearly administration expenses. Ordinarily any attempt at this point to pay pre-petition taxes would give rise to a host of legal and practical problems. But it is difficult to quarrel with the converse proposition that, if the Trustees wish to deal only with post-petition taxes, they should not insist upon release of the pre-petition claims.

The argument can be made, of course, that if it is unfair to exact a larger give-up from some claimants than from others, in exchange for payment of 50% of post-petition taxes, it would also be unfair to penalize those jurisdictions which were "efficient" in their tax collection practices by reducing the amount of post-petition taxes they would now collect, merely because they have no pre-petition taxes to give up.

One solution might be to remove the pre-petition tax claims from the settlement proposal altogether, leaving all taxing authorities free to pursue those claims under the Plan. But any such alteration would undoubtedly make the compromise proposal much less attractive from the Trustees' standpoint. It is apparent that a principal inducement to the Trustees in advancing their compromise proposal is the hope that they might thus eliminate a large number of claims in exchange for a manageable

amount of money, thus simplifying matters considerably and helping to define the scope of the related features of the Plan itself.

Moreover, there is reason to believe that the Trustees' proposal was preceded by careful detailed analysis, and that it represents the considered judgment of a great many knowledgeable persons as to the kind of proposal which might well be acceptable to a large number of tax claimants. In my view, it would be foolhardy for the Court to insist upon major changes in the compromise proposal as a condition of its approval. This is particularly true when the possible consequences of any such changes cannot now be evaluated. Questions of feasibility, as well as fairness, will be before the Court at the hearings on the Plan; until those hearings are held, major alterations of the context in which the Plan is being proposed should be avoided. Stated otherwise, the present record justifies the conclusion that approval of the Trustees' proposed tax compromise would not impair the feasibility of the proposed Plan of Reorganization, but does not justify the conclusion that the compromise offer can be significantly expanded without impairing the feasibility of the proposed Plan.

The question remains, however, whether approval of the proposed compromise should be withheld because of the fact that the offer would require some tax claimants to give up considerably more than others in order to obtain immediate payment of one-half of the post-petition taxes. More specifically, the question as I see it is whether it is possible to achieve some mitigation of the gross disparity, without either penalizing the "efficient" tax collectors or substantially increasing the immediate cash impact of the compromise program. In short, the task of the Court is to reach an equitable result.

I am persuaded that the compromise proposal would be advantageous to the Debtor's estate, and that it would also be advantageous to the taxing authorities to have the opportunity to accept the compromise offer if they see fit. I am also persuaded that mathematically precise equality is nei-ther possible nor necessary. I believe the fairest approach under all of the circumstances would be to exact concessions based upon averages.

If all of the outstanding tax claims were aggregated as a single claim, payment of one-half of the post-petition taxes would constitute payment of 44% of all taxes. By the same token, a hypothetical "average" tax claimant would, by accepting the Trustees' offer to pay one-half of the post-petition taxes, receive 44% of its total tax claim. By offering to pay one-half of all post-petition taxes, the Trustees would be according equal treatment to all tax claimants, insofar as immediate payment of administration claims is concerned. By adding to that offer, in each case, a sum of money sufficient to insure that no tax claimant who accepts the offer would receive less than 44% of the total of both pre- and post-petition taxes, the Trustees would somewhat ameliorate the inequality in the concessions required of the taxing authorities, by insuring that no claimant, in order to avail itself of the compromise offer, would be required to give up more than the hypothetical "average" claimant.

On the basis of the figures set forth in the proposed Plan of Reorganization, it appears that the maximum additional amount of cash which would be required to carry out this modification of the compromise offer, assuming all taxing entities were to accept the modified proposal, would be approximately $8.9 million. It seems unlikely, therefore, that this modification would impair the feasibility of the tax compromise proposal, or of the Plan itself. Needless to say, should this modification cause complications which make the compromise unacceptable to the Trustees, they are at liberty to make further application to the Court.

To summarize, then, I have concluded that if the compromise offer is to be made, the offer should be to the effect that, in exchange for release and discharge of all tax claims, the Trustees would pay 50% of the principal amount of post-petition taxes, or such amount of post-petition taxes as would cause the payment to equal 44% of

the principal amount of all tax claims, whichever is greater.

### B. *Lack of Information*

■ The objecting tax claimants contend that it is somehow unfair to permit the Trustees to make the compromise offer at this time, since they do not now know how this Court, or appellate courts, may rule with respect to the treatment of tax claims in the Plan of Reorganization. These objectors are clearly correct in asserting that. it would be easier to decide whether they would fare better by accepting the compromise proposal or by having their claims dealt with in the Plan of Reorganization, if they now knew for certain exactly what the outcome of the Plan proceedings will be. No doubt the Trustees, also, would be better able to gauge the attractiveness of the compromise offer if they knew for certain whether or not the Plan they have proposed will be approved and consummated without significant changes in the treatment of tax claims proposed therein.

But the point is that no one knows, or can know, at this juncture, what the final outcome of the Plan proceedings will be. The entire thrust of the Trustees' compromise proposal is to make available an immediate-payment alternative for those who would prefer to avoid further litigation.

Until the Court has held hearings on the proposed Plan, and has heard argument on the complex issues involved, it would be manifestly improper to express even a generalized or tentative view as to how tax claims should fare under the Plan, or as to the comparability of the present compromise proposal with the probable treatment of tax claims under the Plan. Indeed, even a recital of the uncertainties involved might be misunderstood as tending to suggest that the compromise offer should be accepted.

The parties are entitled to know, however, that this Court's target date for concluding hearings on the proposed Plan of Reorganization is the month of June 1977; that any and all objections to the proposed treatment of tax claims in the Plan of Reorganization will be carefully considered; and that this Court is sensitive to the need for expeditious decision. Moreover, it is a safe assumption that none of the outstanding requests, whether expressed by formal petitions, or by response, brief, or oral argument, to abrogate Order No. 1 or Order No. 70, or to take any other action which would mandate immediate payment of taxes or permit creditors to proceed with the collection of their claims, will be acted upon until the Plan hearings have been held. Beyond that, the uncertainties alluded to are not within the power of this Court to resolve at this time. Each claimant is free to assess the strengths and weaknesses of the arguments asserted in support of, and in opposition to, the proposed Plan and its treatment of tax claims, and the likelihood and probable duration of resort to the appellate process; to assess its own particular circumstances; and to exercise its own business judgment as to whether or not the proffered compromise should be accepted.

### V. *Amtrak's Objections*

■ The National Rail Passenger Corporation ("Amtrak") has asserted objections to the tax proposal which differ from those already discussed. Before reaching the merits of Amtrak's position, it is necessary to consider whether Amtrak has standing to assert any form of objection to the tax proposal.

Amtrak is not a direct provider of passenger service, but rather contracts with operating rail carriers for them to provide Amtrak's passenger service. The Debtor performed such services for Amtrak from May of 1971 until the conveyance of the Debtor's rail property to ConRail on April 1, 1976. Amtrak has been pursuing a rather complex litigation strategy to assert certain claims allegedly arising from the Trustees' failure to meet their preconveyance contractual obligations. As part of this effort, Amtrak presented to this Court a petition for enforcement of an award made by an arbitration panel, which determined that, during the period before conveyance of the rail system to ConRail, the Trustees had failed to maintain certain passenger track

at the level of utility required by the contract between the Trustees and Amtrak. The relief sought was in the nature of specific performance: an order requiring the Trustees to perform certain engineering services and to plan for, and thereafter carry out, certain large-scale track restoration. I denied Amtrak's request because the conveyance of the railroad to ConRail pursuant to the RRRA rendered performance of track maintenance by the Trustees a legal and practical impossibility. *See In re Penn Central Trans. Co. (Petition of Amtrak to Enforce Arbitration Award)*, 422 F.Supp. 67 (E.D.Pa.1976).

Although I had no occasion at that time to decide whether Amtrak had a claim for damages, I did point to some possible obstacles to the successful assertion of any such claim: Before the arbitrators, Amtrak expressly disavowed any claim for damages; the causal relationship between the level of track maintenance and Amtrak's revenues might be difficult to establish; and the amount of money due the estate from Amtrak under the agreement would have been greater if the Trustees had spent the amount of money for track maintenance which Amtrak contended was necessary. By reiterating these potential infirmities, I do not mean to preclude Amtrak from asserting any claim it may feel is justified. The Third Circuit presently has under advisement Amtrak's appeal in that matter.

It would be difficult to conclude that Amtrak has standing to object to the tax compromise if the only basis for such objection is its alleged right to have the Trustees do heavy track work on ConRail's railroad. However, Amtrak now seems to be asserting that it has administration claims against the estate of approximately $150 to $170 million in contract damages (Docs. Nos. 12096, 12694).[15] While the validity and amount of these claims has not yet been established, the reasonable course at this point is to accord Amtrak standing as an administrative claimant. *Cf.* Rule 8–306(a).

■ Amtrak's objection to the tax proposal differs from others in that Amtrak has not been afforded the opportunity to accept a similar compromise. Its position is essentially that no administration claim should be paid unless and until Amtrak also is paid. This position is simply without merit. The United States has not elected to include Amtrak within the compromise, and absent such consent of the Government it is not possible to require the Government to include Amtrak. Second, Amtrak's claims are not even liquidated. Amtrak's suggestion that the entire case await its pleasure is less than realistic. Finally, payment of the tax claimants will not prejudice Amtrak in any way. Indeed, the potential reduction of the tax claims by one-half would be to Amtrak's advantage. In sum, consummation of the tax proposal will not have an adverse effect on Amtrak's position. If and when Amtrak establishes that it has an administration claim, adequate provision can be made to satisfy its claim.

## VI. *The Proposed Settlement with Personal Injury Claimants*

■ Unlike the tax claims discussed above, the claims for pre-bankruptcy personal injury (or death) do not rank as claims of administration. Ordinarily, these claimants would not be entitled to receive payment in cash unless and until all senior claims have been paid in full in cash or equivalent. Thus, approval of the Trustees' compromise proposal cannot be granted over the objections of senior claimants, unless it can be shown that the rights of the objectors would not be adversely affected.

In this case, most of the senior claimants have expressly consented to the Trustees' proposed compromise. The narrow question, therefore, is whether the interests of objecting senior claimants would be adversely affected by consummation of the Trustees' proposal.

■ It should be noted at the outset that, while pre-bankruptcy personal injury

---

**15.** The claim apparently includes the specific segment of rail line involved in Amtrak's prior petition, as well as additional instances of alleged failure on the part of the Trustees to maintain the quality of the track and roadbed.

claims are generally regarded as mere unsecured pre-bankruptcy claims of general creditors, a strong argument can be made that the usual justification for such treatment—the normal risks assumed when one extends credit—does not apply to personal injury claims. These claimants stand alone among all of the creditors of the Penn Central in the sense that they neither voluntarily extended credit to the Debtor, nor occupied any other business relationship with the Debtor. As an abstract proposition, therefore, it is arguable that the claims of secured creditors should not necessarily be preferred in bankruptcy over these personal injury claims—particularly secured claims arising from credit extended after the personal injuries were sustained.[16]

■ Congressional uneasiness with the normal treatment of personal injury claims in bankruptcy may be readily discerned in the 1976 amendments to § 211(h) of the RRRA, and in the legislative history of those amendments. Indeed, it might not be much of an overstatement to hold that Congress has, in effect, recognized that claims for personal injuries and wrongful death are entitled to priority classification.

Be that as it may, I am persuaded that the settlement with the Government in the present case provides ample justification for permitting the Trustees to carry out their proposal. The amount of cash which would be paid to personal injury claimants under the Trustees' proposal is relatively small (approximately $13 million), and would be more than offset by the monetary value of the deferral of the pay-out of the Government's claims. Thus, to carry out the Trustees' proposal as a condition precedent to the Government's agreement to defer its claim would impair neither the amount, form of payment, or timing of the satisfaction of the claims of the objectors.

## VII. *Source of Cash to be Used*

■ For the reasons thus far discussed, I am satisfied that none of the objections

expressed is sufficient to justify rejection of the proposed compromise settlements. The final question to be considered is whether consummation of the settlement proposals might impermissibly jeopardize valid liens held by any of the objectors. It is clear, of course, that if the Plan of Reorganization as presently proposed is ultimately approved and consummated, the present compromise proposals are entirely consistent with it, and would do no impermissible violence to vested lien rights. The problem is to insure that no such rights will be impaired by carrying out these compromise proposals now, notwithstanding the possibility that the reorganization may abort, or some alternative plan of reorganization may be adopted.

No difficulty arises with respect to the Government's all-encompassing liens, nor with respect to the liens of other secured creditors who are willing to have the compromise proposals carried out. The remaining objections fall into two general categories: (1) Some of the Secondary Debtors object to the use of escrowed funds derived from sales of leased line properties, and (2) some of the taxing authorities object to the use of escrowed funds against which they claim to have liens.

The record establishes that the personal injury settlement can be consummated without affecting these liens. With respect to the proposed tax compromise, the necessity for invading funds in either of the foregoing categories will depend upon how many of the tax claimants elect to accept the Trustees' offer.

It seems probable that these potential problems are more theoretical than real. More importantly, the record justifies the conclusion that, if necessary, the Trustees can adequately indemnify against impairment of leased line and tax lien interests in funds on deposit, should it appear that impairment is threatened. Adequate provisions for the protection of these interests will be included in the Order to be entered.

---

16. Concepts of property interests as of the date the bankruptcy petitions were filed are, of course, important, but not always controlling; witness the treatment of employee claims.

## ORDER NO. 2921

AND NOW, this 22nd day of April, 1977, upon consideration of the "Petition of the Trustees to Pay Pre-Bankruptcy Personal Injury and Wrongful Death Claims" (Doc. No. 11766) ("Petition"), and responses thereto, after hearing thereon, and upon consideration of the Outline of Settlement with the United States of America given preliminary Court approval by Order No. 2744, it is hereby ORDERED that:

1. The Petition is GRANTED.

2. The Trustees are authorized to pay pre-bankruptcy personal injury and wrongful death claims as outlined in the Petition where such claims have been timely filed and liquidated within one hundred-eighty (180) days from the date of this Order, or within such further period as the Trustees may allow pursuant to Paragraph 4 of this Order, or as this Court may direct.

3. The Trustees are also authorized to pay pre-bankruptcy personal injury and wrongful death claims as outlined in the Petition where there now exists a dispute as to the timeliness of the filing of a claim but which is later determined by this Court to be timely filed.

4. Where a claimant is unable to liquidate a claim within one hundred-eighty (180) days from the date of this Order, the Penn Central Trustees are authorized, for good cause shown, to extend the period within which a claim must be liquidated. The Trustees, upon request made at least thirty (30) days prior to the expiration of said one hundred-eighty (180) day period to Robert W. Watson, Proof of Claims Administrator, Suite 2610 IVB Building, 1700 Market Street, Philadelphia, Pennsylvania 19103, will furnish all such eligible claimants with a form for stating why the time should be extended in an individual case.

5. The Trustees shall serve a copy of this Order on:

a. All parties customarily notified in these proceedings;

b. The Secretary of Transportation and the Attorney General of the United States; and

c. All persons, either personally or through their legal representatives, known to have filed a proof or proofs of claim against Penn Central for pre-bankruptcy personal injury or wrongful death.

## ORDER NO. 2922

AND NOW, this 22nd day of April, 1977, upon consideration of the "Petition of the Penn Central Trustees for Authority to Compromise and Pay Real Estate and Other Taxes Deferred Pursuant to Order No. 70" (Doc. No. 11767) (Tax Compromise Petition), the documents filed in support thereof, the Statements of Position filed by the various parties, the Petition of the City of Pittsburgh and other taxing authorities for modification of Order No. 70 (Docs. Nos. 10665, 10784, 10785, 10797) (Pittsburgh Petitions) and hearing having been held, it is hereby ORDERED that:

1. The Penn Central Trustees ("Trustees") are authorized to compromise and settle outstanding tax claims against Penn Central Transportation Company ("Penn Central"), the Secondary Debtors and the non-bankrupt leased lines by payment of 50% of the principal amount of post-petition taxes, or such amount of post-petition taxes as would cause the payment in each case to equal 44% of the principal amount of all tax claims, whichever is greater. Provided that with respect to tax claims of less than $10,000 in principal amount and tax claims in excess of $10,000 which are liquidated by agreement or otherwise for less than $10,000 principal amount, the Trustees are authorized to pay the principal amount of the claim in full.

2. The Trustees are authorized to create a cash fund for the compromise and settlement of taxes pursuant to this Order (Tax Settlement Fund) from the following sources:

a. Monies set aside in respect of defaulted trustees certificates pursuant to Order No. 2158.

b. Escrow deposits relating to taxes owed by tenants of the estate.

c. Proceeds of the sale of equipment deposited under Order No. 366.

d. Funds of Manor Real Estate Co., including monies set aside pursuant to Order No. 1889.

e. Penn Central Securities Litigation Settlement Fund set aside pursuant to Order No. 2050.

f. Unrestricted funds of Penn Central Transportation Co. and various subsidiaries.

3. The Trustees' request for authority to draw upon the restricted and unrestricted funds of the respective leased lines for the creation of a Tax Settlement Fund, but only to the extent of 25% of the amount of post-reorganization taxes, exclusive of interest and penalties, due in respect of such leased lines, is DENIED, WITHOUT PREJUDICE to renewal of such request in the event money in excess of that made available under Paragraph 2 of this Order is necessary.

4. The Trustees shall keep an accounting of all restricted and unrestricted funds of the Penn Central which are used for the creation of the Tax Settlement Fund and of the amount of all outstanding tax claims settled pursuant to this Order, and shall make such accounting available to any interested party for inspection upon reasonable request.

5. In the event that a Plan of Reorganization for the Penn Central and the Secondary Debtors is not approved by this Court and consummated pursuant to the Bankruptcy Act by June 30, 1978, the Trustees shall begin to reimburse the segregated and escrowed accounts of the Debtor which had been used in the creation of the Tax Settlement Fund with the future cash flow of Manor Real Estate Co.

6. Any tax claimant wishing to compromise and settle its outstanding tax claims against the Debtor or leased lines shall so advise the Trustees, in care of Ernest R. Varalli, Controller, Suite 3200, IVB Building, 1700 Market Street, Philadelphia, Pa. 19103, in writing within 180 days of the date of this Order. The Trustees shall serve upon each tax claimant a form or forms upon which the tax claimants may advise the Trustees (1) of the amount of tax claims claimed to be due, and (2) that the compromise and settlement of such claims on terms specified in Paragraph 1 of this Order will be accepted as a full and complete satisfaction of all such claims against the Debtor and the leased lines.

7. The compromise and settlement of outstanding tax claims by and between the Trustees and any tax claimant pursuant to this Order shall constitute a full and complete settlement and satisfaction of all such tax claims against the Debtor and the leased lines, including all claims for interest and penalties, in respect of any period through and including December 31, 1976.

8. No claim against the Debtor or a leased line which is not compromised or settled pursuant to this Order shall be affected hereby, as to amount, priority or otherwise, pending the treatment of such claim in a Plan of Reorganization for the Debtor and the Secondary Debtors approved by this Court and consummated pursuant to the Bankruptcy Act.

9. The Pittsburgh Petitions for a modification of Order No. 70 are DENIED, WITHOUT PREJUDICE.

10. The Petition of the Penn Central Trustees and the Trustee of The Delaware Railroad Company and the Philadelphia, Baltimore and Washington Railroad Company for Authority to Compromise and To Pay Certain Taxes Owed to the City of Wilmington, Delaware (Doc. No. 10810) is GRANTED.

11. Except as provided in this Order, the provisions of Order No. 70 shall remain in effect.