**In the Matter of READING COMPANY, Debtor.**

No. 71–828.

United States District Court, E. D. Pennsylvania.

Aug. 11, 1977.

Howard H. Lewis, James Sox, Philadelphia, Pa., for trustees.

Douglas G. Sanborn, Deputy Atty. Gen., State of N.J., Trenton, N.J., for defendant.

## MEMORANDUM AND ORDER

### No. 1322

DITTER, District Judge.

The Trustees of Reading Company, a railroad in reorganization, have petitioned for an order authorizing Consolidated Rail Corporation ("Conrail") to borrow $16 million from the United States Railway Association ("USRA") on their behalf, pursuant to Section 211(h)(1) of the Regional Rail Reorganization Act of 1973 ("Rail Act"), 45 U.S.C. § 721(h)(1).[1] The loan will be used to liquidate debts incurred for goods and services, to settle interline accounts, and to pay shippers', employees', and personal injury claims.

At the hearing on this matter, the State of New Jersey (State) appeared in opposition, seeking as a condition of the loan full payment of real estate taxes owed by Reading to New Jersey but deferred since July 18, 1972.[2] The State argued that Congress did not intend to authorize loans pursuant to Section 211(h), which would invest Conrail with a "superiority" against the Reading estate for the repayment of such loans,[3] unless the reorganization court could be sure that the estate had sufficient assets to satisfy fully all administrative claimants at the consummation of a plan of reorganization or at liquidation. Following a somewhat abbreviated argument on the record, I approved the petition (Order No. 1287). I added, however, that if their loan application was approved by USRA,[4] the Trustees would not be permitted to utilize the funds until New Jersey's contention had been more carefully considered. Both parties have now submitted briefs and the issue is ripe for determination. I find that the State's challenge to the petition must be denied for two reasons.

■ First, as the Trustees point out, there is absolutely nothing in the Act itself, its legislative history, or that of the amending legislation which imposes upon a railroad seeking the benefits of a loan under Section 211(h) the requirement of demonstrating that its assets will be sufficient to satisfy all administrative claimants. Rather, it is obvious that Congress was well aware that it was conferring preferred status to claimants of the type Reading wishes to pay.[5] The Conference Committee report-

---

1. Actually, Section 211(h) was added to the Rail Act by the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94–210, Section 606. It has been subsequently amended by the Rail Transportation Improvement Act of 1976, Pub.L. 94–555.

2. On that date, I entered Order No. 186, which authorized the Trustees to defer the payment of real property taxes unless (1) the estate's unpaid tax liability exceeded fifteen percent of the annual budget of the taxing authority; (2) the taxing authority could not obtain that money from any other source; and (3) the deferral could produce "serious curtailment of essential services." In a separate proceeding, the State has challenged the continued necessity for this deferral.

3. Section 211(h)(5)(B) of the Act provides:

    The direct claim of the Association under this paragraph, and any direct claim authorized under paragraph (4) of this subsection [which includes obligations paid by Conrail], *shall be prior to all other administrative claims of the estate* of a railroad in reorganization, except claims arising under trustees' certificates or from default on the payment of such certificates [emphasis added].

4. The application was approved by USRA on June 30, 1977.

5. Section 211(h)(1)(B) authorizes loans to fund or pay for
    (i) materials and services;

ing on the Rail Transportation Improvement Act of 1976, commented:

It is the Conference Committee's judgment that, given the nature of the claims not yet ascertained as to amount and the somewhat extensive time period required for those claims to be ascertained, reasonable relief could be afforded to all claimants. In the actions taken last February [the Railroad Revitalization and Regulatory Reform Act], *the Congress gave special status to certain employee-related claims. We reaffirm the judgment that such matters should have special status, due to the nature of those claimants.* [emphasis added].

H.R.Conf.Rep.No.94–1743, 94th Cong., 2d Sess. 34, 1976 U.S.Code Cong. & Admin. News pp. 5846, 5857.

█ It is without question, as the State argues, that a railroad is under a duty to pay state and local taxes as they accrue during a reorganization. 28 U.S.C. § 960. There can also be no doubt that, under normal circumstances, the administrative expenses of a Section 77 reorganization must be paid in full or on a pro rata basis. *In the Matter of Columbia Ribbon Co.,* 117 F.2d 999 (3d Cir. 1941); *In the Matter of Cent. R. Co. of New Jersey,* 412 F.Supp. 927, 931 (D.N.J.1976); *In re Penn Central Trans. Co.,* 325 F.Supp. 294, 298 (E.D.Pa. 1970), aff'd 452 F.2d 1107, 1108 (3d Cir. 1971), cert. denied 406 U.S. 944, 92 S.Ct. 2040, 2043, 32 L.Ed.2d 331 (1972); 3 A *Collier on Bankruptcy* (14th Ed.), ¶ 64.02[4]; 11 U.S.C. §§ 104(a)(1), 205(*1*). Indeed, the Third Circuit held in *Columbia Ribbon,* supra, that the general equitable powers of a bankruptcy court cannot be used to alter the statutory scheme:

The court may not by granting a priority which it deems equitable set aside the clear congressional mandate that no such priority shall be accorded. *Id.* 117 F.2d at 1002.

In reliance upon these general principles, New Jersey argues that had Congress sought to repeal provisions of the Bankruptcy Act in order to provide for the payment of selected administrative claimants, it would have clearly done so. Therefore, it contends, Congress did not ignore these principles but instead first required an assurance that all other administrative claims be eventually satisfied.

█ This rigid adherence to abstract principles of priority, however, ignores two countervailing arguments. In the first place, the Third Circuit has also recognized a rule of "necessity," which allows for the immediate payment of some administrative expenses while others are deferred.

. . . Pro rata participation . . . does not necessarily imply that all claims are entitled to simultaneous participation. To do so would unduly impair the flexibility so essential to a reorganization proceeding.

. . . "But a proceeding under § 77 is not an ordinary proceeding in bankruptcy. It is a special proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised. And to prevent the attainment of that object is to defeat the very end the accomplishment of which was the sole aim of the section, and thereby to render its provisions futile." *In re Penn Central Transp. Co.,* 452 F.2d 1107, 1108 (3d Cir. 1971), cert. denied 406 U.S. 944, 92 S.Ct. 2040, 2043, 32 L.Ed.2d 331 (1972), quoting *Continental Illinois National Bank & Trust Co. v. Chicago, R. I. & Pac. Ry.,* 294 U.S. 648, 676, 55 S.Ct. 595, 606, 79 L.Ed. 1110 (1935).

The deferral of the real estate taxes in this case is only temporary; it has not been suggested that Order 186 was designed to alter to any extent the State's participation in a plan of distribution. Secondly, Con-

(ii) shippers' claims;
(iii) interline and other railroad accounts;
(iv) wage claims;
(v) employees' personal injury claims;
(vi) pension benefits;

(vii) employee health and accident plans;
(viii) employee insurance plans;
(ix) claims for non-employee personal injuries suffered during reorganization; and
(x) required passenger stations.

gress itself has chosen on at least one prior occasion to afford priority to an administrative claim in the context of a rail reorganization. In the Emergency Rail Services Act of 1970, 45 U.S.C. § 661 et seq., Congress granted the United States the highest lien on the property of a debtor railroad in return for the government guaranteeing trustees' certificates. 45 U.S.C. § 662(c).[6] When faced with this clear Congressional intent and the fact that Congress has previously granted priority to one administrative claim over another, New Jersey's contentions simply cannot survive.

The second reason for denying the State's challenge is that there has been no showing that ultimately Reading's assets "will be inadequate to meet in full the reasonably foreseeable first priority claims." *In re Penn Central,* supra, 452 F.2d at 1109. Or, if this is an affirmative duty on the Trustees' part, I would readily conclude that they have sufficiently demonstrated the reasonable expectation that all administrative claims will be satisfied, including New Jersey's taxes. As the financial statement submitted by the Trustees (attached as Exhibit A) reveals, available assets [7] exceeded the railroad's administrative debt as of December 31, 1976, by over 21 million dollars. Absent some evidence to the contrary, this is an adequate assurance that all those debts incurred by Reading during its reorganization will eventually be met.

Exhibit A

READING COMPANY

Administrative Debt Vs. Available Assets
As Of December 31, 1976

| | | | | |
|---|---|---|---|---|
| Current Assets | $ 2,762,531 | Current Liabilities | | $ 1,017,085 |
| Agency Account—Assets | 5,765,380 | Agency Account—Liabilities | | 18,125,224 |
| Special Funds (ICC Account 716) | 13,983,541 | Trustees' Certificates, | | 8,198,948 |
| | | Hurricane Agnes | $ 1,405,490 | |
| Investments | 24,023,803 | 57 Locomotives | 4,801,000 | |
| | | Interest—Hurricane Agnes | 272,348 | |
| | | Interest—57 Locomotives | 1,720,110 | |
| Properties | 30,126,267 | 211(h) Loan to meet Pre-Conveyance Payroll Obligations | 4,321,884 | |
| | | Interest—211(h) Loan | 226,068 | 4,547,952 |
| Certificates of Value | 22,205,340 | Pension, Welfare & Casualty Reserves | | 554,004 |
| Accrued Interest—Certificates of Value | 1,072,539 | Interest in Default (Subsequent to 11/23/71): | | 16,401,838 |
| | | Series "D" Bonds | 8,625,656 | |
| | | U. S. Govt. Guaranteed Loan | 7,776,182 | |
| | | Railway Tax Accruals | | 17,590,551 |
| | | Tax Liability (Subsequent to 11/23/71) | 14,978,601 | |
| | | Interest on Liability  '' | 2,611,950 | |
| | | Amounts Due Affiliated Companies | | 4,879,849 |
| | | Liabilities Deferred Pending Litigation Resulting from Rail Act (Principally Vacation Pay) | | 7,054,365 |
| | | Subtotal | | 78,369,816 |
| | | Excess of Available Assets over Administrative Debt as of December 31, 1976 | | 21,569,585 |
| Total | $99,939,401 | Total | | $99,939,401 |

 ̄ Taxes of approximately $140,000 due State of New Jersey included.

Note· Section 215 Funds from U S.R.A. for track rehabilitation of $3,647,458 not included.

6. Conrail's claims fall directly behind claims on trustees' certificates. See note 3, supra.

7. It is important to note that on the asset side of the balance sheet 1) Properties are listed at book value, rather than at the higher appraised value and 2) the Certificates of Value may eventually be valued upward, depending upon the result of the Special Court valuation proceeding.