As part of its petition, Reading asks for an order requiring Trailer Train to deposit with the court "an amount equal to the present book value of Reading's stock in order to ensure that sufficient monies will be available . . . ." [petition ¶ 5(c)]. Trailer Train opposes this by claiming that the posting of security would amount to prejudgment seizure of Trailer Train's property in violation of due process.

**In the Matter of READING COMPANY, Debtor.**

**Bankruptcy No. 71–828.**

United States District Court, E. D. Pennsylvania.

Jan. 16, 1980.

---

Howard H. Lewis, James A. Sox, Philadelphia, Pa., for petitioner.

Douglas G. Sanborn, Deputy Atty. Gen. for N. J., Trenton, N. J., for respondent.

MEMO AND ORDER RE: READING COMPANY TRUSTEES' PETITION FOR PERMISSION TO DRAW DOWN ESCROWED FUNDS TO MAKE CERTAIN PAYMENTS PRIOR TO CONSUMMATION OF A PLAN OF REORGANIZATION

DITTER, District Judge.

In 1971, Reading Company filed for reorganization under section 77 of the Bank-

ruptcy Act. Thereafter, and pursuant to several orders of this court, escrow accounts were established with certain Philadelphia banks for the deposit of proceeds from the sales of non-real estate assets, including surplus equipment and rail, scrap, and coal. At this time, approximately seven million dollars is being held in these non-realty escrows.

Reading's trustees have petitioned for leave to draw from these escrowed funds to make payments of certain debts. One of Reading's creditors, the State of New Jersey, objects to the use of the funds to pay obligations that could be funded by loans under section 211(h) of the Regional Rail Reorganization Act.

Based upon the evidence produced at a hearing on this matter, and the records of this court, I make the following:

## FINDINGS OF FACT

1. Reading has on deposit with certain Philadelphia banks approximately seven million dollars from the sale of non-real estate assets. By way of example, these funds arose from:

(a) a sale of two locomotives authorized by Order No. 498, dated November 16, 1973;

(b) the sale of two locomotives authorized by Order No. 817, dated May 15, 1975;

(c) the sale of rail from the Catawissa Branch authorized by Order No. 1356, dated September 22, 1977; and

(d) the sale of ties, rail, coal, equipment, and materials authorized by Order No. 1227, dated November 23, 1976.

2. The trustees have concluded that a portion of these funds should be used to pay

the following outstanding obligations prior to the consummation of their plan of reorganization:

| | | |
|---|---|---|
| (a) Claims valued at less than $250.00, payment of which was authorized by Order No. 1740 | | $ 171,880.00 |
| (b) Estimated obligations which could be funded under the § 211(h) loan program of the Regional Rail Reorganization Act, 45 U.S.C. § 721(h) | | |
| Personal injury/property damage claims | 1,226,803. | |
| Interline payables | 1,633,931. | |
| Miscellaneous accounts payable | 1,646,177. | |
| Employee wage claims | 290,000. | $4,796,911.00 |
| (c) Erie Lackawanna Railroad Freight Interline Trust Funds | | $ 125,000.00 |
| | TOTAL | $5,093,791.00 |

3. No objection has been made to the use of the escrowed funds for the payment of claims of less than $250. authorized by Order No. 1740 or for the payment of the Erie Lackawanna Railroad Freight Interline Trust Funds obligation.

4. One of Reading's creditors is the State of New Jersey to which Reading owes money for real estate taxes covering the period from 1971 through 1976. Since 1976, Reading has paid all of its New Jersey real estate taxes. Reading's properties are assessed in its own name and those of three subsidiaries, Delaware and Bound Brook Railroad Company, Trenton-Princeton Traction Co., and Port Reading Railroad Company. Reading and New Jersey do not agree on exactly what Reading owes, but the amounts set forth below are substantially correct:[1]

---

1. At the time of the hearing on this matter, Reading offered an exhibit which purported to show the amounts which it owed New Jersey. Counsel for New Jersey objected to its admission despite testimony that the figures in question had been obtained from New Jersey's own records. I permitted counsel for New Jersey to submit his own schedule of the amounts due. He did so, although payment dates rather than payment amounts were shown and assessments for 1976 had not been reduced to reflect the fact that Reading's operating properties

had been conveyed to Consolidated Rail Corporation on April 1 of that year. Thereafter, Reading adopted the same format which counsel for New Jersey had used and showed how its payments were applied to properties assessed in Reading's name or to those of its subsidiary companies. Counsel for New Jersey has not objected to Reading's exhibit which sets forth these payments. In my view, New Jersey's apparent overstatement of its claim does not enhance its merits.

| Property assessed in the name of: | Total Assessment | Total Payment | Balance Due |
|---|---|---|---|
| (a) Reading Company | $22,950. | $18,500. | $4,450. |
| (b) Delaware and Bound Brook Railroad Company | 94,200. | 22,500. | 71,700. |
| (c) Trenton-Princeton Traction Co. | 8,550. | 8,550. | None |
| (d) Port Reading Railroad Company | 541,500. | 507,800. | 33,700. |

Thus, for all Reading Companies, New Jersey has been paid for the years 1971 through 1976 approximately $557,400. against a total assessment of $667,200., leaving about $110,000. due. In addition, interest of between $80,000. and $90,000. is due on the unpaid balances.

5. In addition to the above amounts, Reading admits that it owes New Jersey approximately $17,000. for corporate franchise taxes.

6. Although it does not object to the use of escrowed funds to settle claims valued at less than $250., or for the payment of Erie Lackawanna Railroad freight interline trust funds (See categories (a) and (c) in paragraph 2 above), New Jersey does object to the use of escrowed funds for the payment of obligations which could be funded under the section 211(h) loan program of the Regional Rail Reorganization Act. (See category (b) in paragraph 2 above).

7. Section 211(h) provides that a bankrupt rail company can borrow money from the government to pay for services rendered and materials supplied prior to the line's conveyance of its rail assets to Conrail. Included in the categories for which funds may be borrowed are those for materials and services, shippers' claims, interline and other railroad accounts, wage claims, employees' personal injury claims, etc. The debts which the trustees wish to pay by the use of escrowed funds come within those authorized for a section 211(h) loan.

8. Section 211(h) also provides a means by which the cash or other current assets of a railroad in reorganization, the properties of which have been conveyed to Conrail, can be obtained from it and utilized in the post conveyance period to help pay the obligations in question. (See section 211(h)(3)).

9. Section 211(h) does not contain language which would limit the bankrupt estate's right to pay its own section 211(h) claims.

10. Reading's trustees have filed a plan of reorganization which is presently before the court for consideration.

11. One of Reading's creditors is the United States. Reading owes the United States approximately 4.8 million dollars plus interest as the result of a loan used for the purchase of 57 locomotives and approximately 19 million dollars, plus interest, for moneys previously advanced under the section 211(h) loan program. Reading's total indebtedness to the United States is approximately 30.6 million dollars.

12. A condition imposed by the United States to its approval of Reading's plan of reorganization has been that Reading pay 5 million dollars to the United States. However, the United States is willing to forego that payment if Reading's trustees use escrowed funds for the payment of the obligations referred to in the petition now before the court.

13. If approval of the present petition is refused, Reading will request that Conrail pay these debts. Conrail does not have sufficient cash to pay them, but could ask United States Rail Association (USRA) to petition this court to have the escrowed funds in question identified as "cash" or "other current assets of the estate", available to "be utilized to satisfy obligations" of the estate. See section 211(h)(3).

14. The circuity of such a petition by USRA, identification by this court, payment to Conrail, and payment by Conrail of Reading's debts would benefit no one.

15. The immediate availability of funds for the payment by Reading of its section 211(h) obligations will benefit the estate by enabling it to make quicker and better settlements of the claims against it, save it interest charges, ease its administrative burdens, and promote the eventual adoption of a plan of reorganization.

16. New Jersey's claims against the Reading are minimal and the payment by Reading of the section 211(h) claims will have no appreciable effect on its ability to pay New Jersey's claims.

## DISCUSSION

Reading's trustees have presented a plan of reorganization and view the payment of some preconveyance debts as a step toward the plan's consummation.

In *In re Penn Central Transportation Co.*, 570 F.2d 1189 (3d Cir. 1978), the Court of Appeals set forth the principal tenets of the Regional Rail Reorganization Act, 45 U.S.C. §§ 701–794. To protect the public's interest in continued rail services, Congress provided for the restructuring of a system to be operated by Conrail. The bankrupt estates were to continue rail operations until their properties were conveyed to Conrail. Section 211(h), one of the 1976 amendments to the Act, recognized that if rail services were to continue until conveyance, a means to insure payment of certain pre-conveyance debts would be needed for the post-conveyance period.

In section 211(h), Congress identified the expenses which the bankrupt estates would incur until conveyance and provided that funds for their payment could be obtained by loans from the government or from assets of the estates themselves. The USRA was empowered by section 211(h) to petition the reorganization courts for identification of cash or other assets of the bankrupts which could be utilized for the liquidation of these obligations.

The purpose of the present petition by Reading's trustees is to obtain my permission for the use of escrowed funds to pay pre-conveyance debts, all of which fall within the categories listed in section 211(h). The propriety of these debts is not questioned. The amounts of the debts are not questioned. Their classification under the section 211(h) label is not questioned. Reading wants to pay the debts. Conrail wants Reading to pay the debts. The United States, Reading's largest single creditor, wants Reading to pay the debts. Neither Reading's bondholders nor its stockholders object. Only one creditor objects: the State of New Jersey.

■ In objecting, New Jersey does not question that these debts will have to be paid eventually, that Reading's estate will be depleted thereby, or that the formal requirements for a 211(h) loan (see 211(h)(1)(B), for example) could be met. In fact, New Jersey does not object to the payment of the debts at all,[2] but only objects to Reading's paying them as contrasted with having Conrail do it with Reading's funds which would be obtained for Conrail from Reading by court order on the petition of USRA. There is nothing in section 211(h), however, which justifies the circuity, extra expense, or additional burdens on Conrail and Reading which New Jersey seeks. To the contrary, the language of section 211(h) shows Congress intended the estates to pay their own debts where possible. See sections 211(h)(3)(B) and 211(h)(4)(D).

It was the Congressional intent that the loan funds were to be used *in conjunction with the assets of the estates* to meet 211 claims, *and not in lieu of the assets of the estates.*

Several of the reorganization courts, however, have made a different interpretation of the act. The courts have been reluctant to use assets of the estate, except current accounts receivable, to pay these claims. In addition, the court has been unclear as to what specific claims could be paid with 211(h) funds. In some cases, unfortunately, the courts have held that available estate funds should be applied to the payment of obligations which are not eligible for 211(h) funding. The end result of these interpretations prevents USRA from releasing any funds to ConRail and the other acquiring carriers

**2.** On a prior occasion, New Jersey objected to Conrail's borrowing of $16 million through USRA to pay Reading's section 211(h) debts. Its objection was overruled. *In re Reading Co.*, 439 F.Supp. 389 (E.D.Pa.1977).

to pay these claims. We have, therefore, amended 211(h)(2) to make our original intent clear.

Legislative History, Rail Transportation Act of 1976, Senate Report No. 94–851, 94th Cong., 2nd Sess., 34–35, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 5837, 5857–58 (emphasis added).

New Jersey gives two reasons for objecting to Reading's direct payment.

■■■ First, New Jersey contends that Reading's paying of 211(h) debts in this way amounts to a preference. I conclude, however, that Reading's use of its escrowed funds for this purpose would not be an impermissible preference because the debts which Reading wishes to pay have been given special recognition and status by Congress. *In re Reading Co.*, 439 F.Supp. 389, 391 (E.D.Pa.1977). Section 211(h) creates high priority claims which of necessity displace those of other creditors who must yield to the interest of the public in uninterrupted rail service. *In re Ann Arbor Railroad Co.*, 414 F.Supp. 812, 818, 819 (E.D. Mich.1976). See also *In re Penn Central Transportation Co.*, 431 F.Supp. 671, 684 (E.D.Pa.1977).

■■■ In order to keep the railroads running, Congress guaranteed payment of section 211(h) debts. First, it provided funding. Where a bankrupt estate lacked the cash to pay its necessary pre-conveyance expenses, a loan could be obtained. Second, the reorganization courts were prohibited from placing any limitations on the payment of section 211(h) obligations.[3] Third, Congress gave section 211(h) loans a priority over other debts of the estate. Their priority over state and local taxes, for example, is made clear by the statute. *In re Penn Central Transportation Co.*, 596 F.2d

1102, 1118 (3rd Cir. 1979). To be very specific about it, the legislative history of section 211(h) contains this language, "If the application of these funds are (sic) not specified in this manner, thereby protecting the Government's interest, the funds could be diverted for payment of claims that are not eligible for section 211(h) loans. For example, the funds could be used to pay taxing authorities for past due taxes. Claims for past due taxes are not eligible for section 211(h) loans because their repayment was not necessary to avoid disruption of rail service immediately prior to conveyance." Senate Report No. 94–851, 94th Cong., 2d Sess., 35, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 5837, 5858.

I conclude that Reading's use of its escrowed funds to pay section 211(h) debts is not an illegal preference but rather is a use of its funds for the purposes intended by Congress.

■■■ New Jersey's second objection to the payment of these debts is that "it would, in effect, represent a consumation (sic) of a part of the Trustees' Proposed Plan of Reorganization before this court has determined whether it can and will 'approve' that plan." Statement of Position of the State of New Jersey with Respect to the Trustees' Petition for Permission to Draw Down Escrowed Funds to Make Certain Payments Prior to Consumation (sic) of a Plan of Reorganization. This objection is also frivolous. Obviously this same objection would apply to anything the trustees might do to enhance the chances that their plan will be successful. Apparently the state's position is that by the very act of presenting a plan of reorganization the trustees have immobilized themselves from taking any steps which might bring the

---

**3.** Section 211(h)(2) in pertinent part provides: Nothing in this subsection shall be construed as permitting any district court of the United States having jurisdiction over the reorganization of a railroad in reorganization in the region to enjoin, restrain, or limit the Corporation, the National Railroad Passenger Corporation, or a profitable railroad from applying, to payment of the obligations of the estates identified in paragraph (1) of this sub-

section, amounts collected as (A) accounts receivable pursuant to this paragraph, (B) cash or other current assets identified pursuant to paragraph (3) of this subsection, or (C) proceeds of loans pursuant to paragraph (1) of this subsection. Any agency agreement executed prior to October 19, 1976, shall be deemed amended to the extent necessary to conform such agreement or order to the provisions of this paragraph.

plan into fruition. No authority is cited to support this interesting theory nor has any reason in law or logic occurred to me. I conclude that the trustees need not lie dead in the water just because they have presented a plan of reorganization for approval.

CONCLUSIONS OF LAW

1. Section 211(h) claims enjoy a special status which gives them a priority over the claims of New Jersey for past due taxes.

2. There is nothing in section 211(h) to preclude a bankrupt's paying its own section 211(h) claims if it has the funds to do so.

3. Section 211(h) loan funds should be used in conjunction with the assets of a bankrupt to meet section 211(h) claims and not in lieu of those assets.

4. The payment of Reading's section 211(h) debts will ease its administrative burdens and enhance its ability to reorganize.

5. Reading may draw down its escrowed funds, derived from the sales of non-realty assets, to pay its section 211(h) debts.